AVCO CORPORATION, TEXTRON LYCOMING RECIPROCATING ENGINE DIVISION OF AVCO CORPORATION, Appellant,

v.

INTERSTATE SOUTHWEST, LTD., Appellee.

No. 14–05–00860–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 1, 2007.

Supplemental Opinion Overruling Rehearing April 3, 2008.

See also 145 S.W.3d 257.

Jack G. Carnegie, James Harmon Hall II, Scott Wagner Cowan, Houston, Miguel A. Estrada, Washington, DC, Theodore J. Boutrous Jr., William Thomson, Los Angeles, CA, for appellant.

Harold H. Walker Jr., Martin E. Rose, Steven Dominic Sanfelippo, Dallas, Roger D. Townsend, Houston, for appellee.

Panel consists of Justices ANDERSON, GUZMAN, and Senior Justice HUDSON.*

* Senior Justice J. Harvey Hudson sitting by assignment.

## OPINION

EVA M. GUZMAN, Justice.

In this commercial dispute, we are asked to determine questions regarding standing and capacity, the proper scope of declaratory relief, and the application of the express-negligence rule, as well as traditional sufficiency challenges to certain evidence. The appellant, an aircraft engine manufacturer, contracted with a forging company for the production of crankshaft forgings made to the manufacturer's specifications.[1] After a series of crankshaft failures, an affiliate of the forging company sued the engine manufacturer, alleging that the manufacturer wrongfully concealed information about the failures, fraudulently induced the forging company to extend the contract, and obtained the execution of a contract extension by deception. The affiliate also sought a ruling that the manufacturer was not entitled to contractual indemnity. The jury found in favor of the affiliate on its fraud claims and awarded it damages for increased insurance premiums and fees for expert witnesses, together with attorneys' fees, costs, and more than $86 million in exemplary damages. We conclude that the affiliate has standing to assert the claims at issue, but the evidence is legally insufficient to support the actual damages awarded. We therefore reverse and render judgment that the affiliate take nothing, but we affirm the trial court's conclusion that the contractual indemnity provision at issue is unenforceable

under both Texas and Pennsylvania law. We remand solely for the determination of the appropriate amount of attorneys' fees and costs, if any, to award to either party in light of our rulings on the dispositive issues.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Master Supply Agreement

Appellant Textron Lycoming Reciprocating Engine Division of AVCO Corporation ("Lycoming") manufactures aircraft engines, but does not manufacture all of the component parts. On May 4, 1995, Lycoming entered into a Master Supply Agreement ("MSA") to obtain crankshaft forgings from Wisconsin corporation Interstate Forging Industries, Inc. ("IFI").[2] The forgings were to be made to Lycoming's specifications, and the MSA provides that IFI "will not delegate or subcontract any of the work or duties to be performed hereunder without the prior written consent" of Lycoming.[3]

The MSA also includes asymmetrical indemnification provisions. Section 5.3, paragraph 1 of the MSA provides:

> Buyer [Lycoming] shall indemnify, reimburse, and hold Seller [IFI] harmless, its subsidiaries *and affiliates* and their respective officers, directors and employees from and against any and all losses, liabilities, claims, costs, demands, judgements [sic], penalties, fines, inter-

---

1. The pistons of the aircraft engines at issue connect to rods that turn the crankshafts, and the crankshafts turn the propellers of the aircraft.

2. Interstate Forging Industries, Inc. subsequently converted to a limited liability company known as Citation Wisconsin Forging, L.L.C. For the sake of clarity, we have referred to this single entity as IFI.

3. The MSA originally provided that either party could terminate the agreement immediately upon certain occurrences, including:

 > [t]he sale or transfer of more than fifty percent (50%) of all or substantially all of the assets or stock or upon the occurrence of any other transaction that results in a change of ownership or control of a party unless the other party shall have expressly agreed thereto in writing. . . .

 This provision was deleted in the First Addendum to the MSA on May 4, 1995.

est, expenses or monetary damages of any kind (including, without limitation, court costs, reasonable fees, expense[s] and disbursements of attorneys and consultants) (collectively "Damages") asserted against, imposed upon or incurred by Seller, *as a result of claims or lawsuits by third parties,* (including any such claim or lawsuit for personal injury or property damage) *where liability is based solely on a defect in design* and/or a defect in the warnings and instructions provided by Buyer *without any negligence on the part of Seller.*

(emphasis added). The second paragraph of section 5.3 requires IFI to indemnify Lycoming for such "Damages":

> asserted against, imposed upon or incurred by Buyer [Lycoming], *whether or not involving liability to any third party,* resulting from or arising out of any claim, lawsuit ... recall, retrofit or government investigation or proceeding against Buyer *relating to performance or defects* (including without limitation, manufacturing defects), or the breach of any express or implied warranty for any Products manufactured by Seller [IFI] pursuant to this Agreement, *except to the extent that such Damages are directly caused by the negligence of the Buyer.*

(emphasis added).

## B. The Assignment and Assumption Agreement Between IFI and ISW

Before producing any crankshaft forgings, IFI executed an "Assignment and Assumption Agreement" ("Assignment Agreement") in October 1996 to accomplish three stated purposes. First, IFI assigned all the assets of its "Interstate Southwest division" to Interstate Southwest, Ltd. ("ISW"). The assigned assets included the physical plant in Navasota, Texas where the crankshaft forgings were to be produced. According to ISW, IFI's contract with Lycoming was also assigned to ISW. In exchange for its assets, IFI received a 98% partnership interest in ISW. IFI did not obtain Lycoming's consent to the transfer or inform Lycoming of the arrangement, and Lycoming contends it had no knowledge of the Assignment Agreement between IFI and ISW until this suit was filed.

Second, the Assignment Agreement designated ISW the "true and lawful attorney" for IFI with "full power of substitution, for [IFI] ... in its name and stead or otherwise...." It similarly authorized ISW to "prosecute in the name of [IFI] or otherwise ... any and all proceedings ... which [ISW] may deem proper in order to collect, assert or enforce any claim, right or title of any Division Assets, and do all other acts and things in relation thereto as [ISW] ... shall deem desirable...."

Third, the Assignment Agreement required ISW to indemnify IFI. Under this provision, ISW "assumes, holds [IFI] harmless from, and agrees to pay and satisfy and fulfill, the Division Liabilities." ISW further agreed "absolutely and unconditionally to defend, indemnify and hold [IFI] harmless from all claims arising directly or indirectly from or with respect to the Division Liabilities, against or with respect to [ISW] or [IFI], or both, and to satisfy and pay same...."

On the same day that it executed this agreement, IFI assigned its partnership interest in ISW to ISW's limited partner, a Delaware corporation known as ISW Texas Corporation. IFI owns that company. ISW's general partner, Texas Steel Corporation, is wholly owned by Citation Corporation ("Citation"), as is IFI. Thus, both IFI and ISW are affiliated with Citation. Ed Buker, Citation's Chief Executive Officer, is also the chairman of both IFI and ISW.

## C. Changes in Specifications and Manufacture

Lycoming received the first shipment of crankshaft forgings on March 4, 1997. On November 16, 1998, Lycoming issued an engineering change order requiring the vanadium content of the forgings to be "controlled" to 0.07% to 0.11%. The change order further provided, "This material modification ensures a 2nd tempering temperature of 1100° F or higher (at least 100° F higher than the 1st tempering temperature) for 5 hours to meet the engineering drawing hardness requirements . . . ." (capitalization normalized).

Beginning the following month, forgings were manufactured in a different furnace that was generally operated manually rather than by using the temperature controls outside of the furnace.

## D. The Crankshaft Failures

### 1. Failure to Heat–Treat Forgings

Beginning in 1999, a number of crankshaft failures occurred. In some instances, the cause of the failure is undisputed. For example, on July 27, 1999, Lycoming notified IFI of an engine failure due to the forging facility's failure to heat-treat the crankshaft forgings.[4] Similar failures followed. On May 15, 2000, Lycoming wrote IFI regarding 54 crankshaft forgings that lacked heat treatment; the consequences of this "quality escape" included two in-flight failures.[5] Lycoming wrote that IFI "must recognize [its] liability" and asked that IFI notify its insurance carrier of the

problem. Lycoming further opined that the defects were caused by "inadequate process controls to ensure proper heat treatment."

IFI subsequently reached a settlement with Lycoming regarding these failures. As part of this settlement, the parties agreed to a change in the forging process. Specifically, Lycoming accepted IFI's offer to "build press-tooling or hammer-tooling to put the parts on the press . . . ."[6]

### 2. Subsequent Crankshaft Failures

Other engine failures occurred for which the cause was not readily apparent, and Lycoming instructed its employee, Dr. Yoon Kim, to investigate. The crankshafts at issue have six crankpins, and the failures that are the basis of this litigation generally originated below the outer nitride casing of the crankshaft near or between the fifth and sixth crankpins.

On June 28, 2000, a Lycoming engine failed after approximately 100 hours of service. In his report dated July 27, 2000, Dr. Kim concluded that a connecting rod bearing had failed, and the resulting stresses caused a subsurface fracture to the crankshaft between the fifth and sixth crankpins. On May 31, 2000, a crankshaft failed in a Lycoming engine after 262 hours of service, but the report on that failure, which occurred in Australia, was not completed until September 21, 2000. A surface fracture was observed on this crankshaft, and this failure was also attributed to a bearing failure. A third failure

---

4. As previously noted, Lycoming contends it had no knowledge of IFI's Assignment Agreement with ISW and did not know that the crankshaft forgings were actually produced by ISW. Thus, Lycoming continued to direct its communications to IFI, and neither IFI nor ISW corrected Lycoming.

5. Lycoming's correspondence of July 27, 1999 and May 15, 2000 are both addressed to "Interstate Forging Industries[,] Inc."

6. According to evidence offered by ISW, Lycoming had previously asked that its forgings be produced using this method, but until the settlement, the forging supplier had refused because the change would increase the cost of production.

occurred on August 29, 2000. In his report dated October 25, 2000, Dr. Kim attributed the surface fracture in front of the sixth crankpin to the shifting of a bearing. In each of these three failures, the crankshaft forgings had been heat-treated.

IFI was not immediately informed of the failure of these heat-treated crankshafts. Although Lycoming met with IFI on November 29 and 30, 2000 regarding costs for three other failed crankshafts that had not been heat-treated, Lycoming did not disclose at this time that the three heat-treated crankshafts described above had also failed.

### E. The Second Addendum to the MSA

By this time, the original five-year MSA had expired, but Lycoming continued to order and receive crankshaft forgings, ostensibly from IFI. To renew the MSA, Lycoming and IFI negotiated a Second Addendum signed by IFI on April 26, 2001 and by Lycoming on July 17, 2001. ISW is not a signatory to and is not mentioned in the Second Addendum, which extended the MSA for another five years.

### F. The Crankshaft Failures Continue

After the Second Addendum was successfully negotiated, Dr. Kim continued to analyze additional failures. He completed another failure analysis on July 3, 2001. This was the first instance in which Dr. Kim concluded that a crankshaft failed due to subsurface fatigue from abnormally high stresses of unknown cause.

On October 19, 2001, Dr. Kim wrote to IFI that a crankshaft had failed after 886.8 hours of service. According to Dr. Kim, the failed crankshaft included 0.08% vanadium and contained a microscopic "honeycomb" structure. Concerning this structure, Dr. Kim wrote:

We do not know the cause of its formation nor its effect on the mechanical properties[,] especially on the fatigue property. You can do whatever you want to do with the impact test sample to determine the cause of the honeycomb structures. Please let me know your findings as soon as possible.

On December 11, 2001, Lycoming and IFI personnel met concerning ten crankshaft failures. Two days later, Lycoming prepared an engineering order requiring vanadium to be limited to .01% and the second heat tempering to be conducted at temperatures not exceeding 1150° F.

Lycoming had previously consulted an outside engineering firm regarding the failure of the heat-treated crankshafts, and on December 19, 2001, James M. Hilts of Kingsway Engineering Services completed his report to Lycoming. Hilts wrote that "the metallagraphical [sic] evidence indicates that the crack could have started as an elliptical[-] shaped (football) inclusion roughly $0.005 \times 0.01$ inches lying 0.011 inches below the 0.026[-] inch thick nitride case." Although Hilts tested material that was "not the exact form, strength or heat treatment as the failed material[,]" he concluded that "[i]f the maximum cyclic stresses are truly in the range of 33 to 54 ksi[,][7] no surface crack would have initiated on the surface" of the crankshaft. Thus, he reasoned, "[i]nitiation of a surface crack would require stresses well over 70 ksi[;][t]herefore, there must have been a pre-existing defect."

Lycoming then began to recall crankshafts that were already in service. On February 1, 2002, Lycoming issued a mandatory service bulletin recalling crankshafts manufactured under the MSA that were used in Lycoming's six-cylinder tur-

7. "Ksi" is the abbreviation for "kilopounds per square inch" and is a measurement of tension.

bocharged engines. Ten days later, the Federal Aviation Administration ("FAA") issued a similar Airworthiness Directive concerning all Lycoming turbocharged TIO–540 and LTIO–540 engines of 300 hp or higher that were manufactured from March 1997 to February 2002.

Lycoming provided an update to IFI on February 19, 2002, informing it of seven confirmed and six unconfirmed crankshaft failures.[8] In this letter, Brock A. Spigelmyer, Design Engineer for Lycoming, wrote that Lycoming's "investigation has been focusing primarily on the presence of honeycomb-like features found on the fracture surfaces" because "[t]he investigation has ruled out the possibility of any dimensional or machining[-]related problems and the design itself has been substantiated by 20 or more years of reliable service."

### G. The Release and Indemnity Agreement and the Replacement Crankshaft Agreement

Additional recalls followed in August and September 2002. Lycoming attempted to negotiate an agreement under which IFI would produce replacement crankshafts, but IFI refused to do so unless Lycoming agreed to indemnify it for past and future crankshaft failures. Thus, Lycoming entered into the following pair of agreements on October 14, 2002, to address the need for replacement crankshafts. These are the only agreements in the record between Lycoming and ISW concerning the production of crankshaft forgings.

#### 1. The Release

In the Release and Indemnity Agreement (the "Release"), Lycoming, Citation, IFI, and ISW agreed that "the Parties have a dispute concerning whether [IFI] is required to produce the Replacement Crankshafts pursuant to the terms of the [MSA] made as of May 4, 1995, as amended, and are entering into this [Release] without prejudice to their respective positions on that issue...."[9] They further agreed that:

> [The Release] will not amend, alter, or modify the terms of the MSA, except to the extent specifically set forth in this [Release], reserving to ISW, [IFI], and Citation their contention that the MSA is invalid and reserving to ... Lycoming [its] opposition to that contention and [its] damage claims, if any, except as limited by this [Release].

Under the terms of the Release, ISW agreed to produce replacement crankshafts subject to a Replacement Crankshaft Production Agreement ("Replacement Crankshaft Agreement") attached as an exhibit to the Release and incorporated by reference. Lycoming released and agreed to indemnify IFI, ISW, and Citation for costs, losses, and damages these entities incurred "as a result of claims or lawsuits of any kind by any third party or [Lycoming] relating to the Replacement Crankshafts."

#### 2. The Replacement Crankshaft Agreement

In the Replacement Crankshaft Agreement, Lycoming and ISW acknowledged the contemporaneous execution of the Release and agreed that:

> [T]his [Replacement] Agreement is separate from, and not governed by, the [MSA] between the parties, and [the parties] have further agreed that this [Replacement] Agreement will not amend, alter, or modify the terms of the MSA, except to the extent specifically

---

8. This letter is addressed to "Interstate Forging Southwest."

9. Textron, Inc. and Avco Corporation are also parties to the Release and Indemnity Agreement.

set forth in this [Replacement] Agreement, reserving to ISW its contention that the MSA is invalid and reserving to Lycoming its opposition to that contention and its damage claims, if any, except as limited by this [Replacement] Agreement and the attached Release. . . .

Neither the Release nor the Replacement Crankshaft Agreement mentions any assignment of rights or assets, delegation of duties, or the existence of an attorney-in-fact relationship between IFI and ISW.

Although the record does not reveal any failures of crankshafts produced pursuant to the Replacement Crankshaft Agreement, liability for failures of crankshafts produced pursuant to the MSA and its Addenda remained unresolved. For example, less than a week before the Release and Replacement Crankshaft Agreements were executed, Lycoming and IFI were sued in federal court for damages arising from one or more of the failures of crankshafts produced pursuant to the MSA and its Addenda (the *"Flying Frog* litigation");[10] executives of IFI and ISW were concerned that Lycoming would seek indemnification for its own losses as well as for damages to third parties. Eventually, both ISW and Lycoming attempted to resolve the indemnification question by bringing suit in their respective home states.

**H. The Texas Suit**

ISW filed the instant lawsuit in Grimes County on April 23, 2003, asserting causes of action for (1) business disparagement, (2) breach of contract based in part on Lycoming's failure to inform ISW earlier of the crankshaft failures, (3) contractual contribution and indemnity under section 5.3 of the MSA, (4) declaratory judgment concerning the indemnity provisions of the MSA, and (5) attorneys' fees and costs pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code. ISW asked the trial court to hold that the paragraph of the MSA regarding IFI's duty to indemnify Lycoming was unenforceable because it was against public policy and a contract of adhesion. At the same time, ISW asked the trial court to declare that ISW was entitled to contractual indemnification from Lycoming under the MSA. Although ISW incorporated the MSA and its addenda by reference in its original petition, the pleading contained no allegations that IFI had assigned the MSA to ISW or that ISW was acting in a representative capacity.[11]

**I. The Pennsylvania Lawsuits**

The day before it answered this suit, Lycoming sued IFI and Citation—but not ISW—in a Pennsylvania state court on May 22, 2003. In that suit, Lycoming sought indemnification for its losses arising from the crankshaft failures. In a separate Pennsylvania lawsuit, Lycoming agreed with IFI and Citation to the entry of an Agreed Order for Preliminary Injunction on June 12, 2003. The injunction required IFI and Citation to "produce and provide all crankshaft forgings ordered by [Lycoming] pursuant to the [MSA]." Although the Texas trial court granted ISW a temporary anti-suit injunction to prevent Lycoming from prosecuting the Pennsylvania actions, this court reversed the trial court's order and dissolved the injunction. *AVCO Corp. v. Interstate Sw., Ltd.,* 145

---

10. *Flying Frog, L.L.C. v. Cessna Aircraft Co.,* No. H–02–3817, filed on October 8, 2002 in the United States District Court for the Southern District of Texas, Houston Division.

11. IFI later intervened in the suit, and Lycoming objected on several grounds. The trial court struck the intervention, and none of the parties contend the trial court erred in doing so.

S.W.3d 257, 260 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

## J. The Texas Causes of Action

On June 26, 2003, ISW filed its First Amended Original Petition in this case. This petition contains ISW's first mention of the Assignment Agreement. The pleadings were amended several more times, and the case was eventually tried on ISW's Sixth Amended Original Petition, filed June 1, 2004, and its First Trial Amendment, filed February 7, 2005. In its live pleadings, ISW alleges that Lycoming concealed the crankshaft failures from IFI and ISW, but privately attributed the failures to deficiencies in the forging process. According to ISW, "Lycoming and IFI, with the full knowledge and consent of ISW (and on behalf of ISW) executed the Second Addendum to the MSA in the early summer of 2001" and at that time, Lycoming (1) had no intention of performing under the MSA; (2) knew the crankshafts were under-designed, and knew that IFI and ISW did not know this; and (3) knew that IFI and ISW had no knowledge of the additional crankshaft failures.

ISW also asserted causes of action for fraud, fraudulent inducement of the MSA and Second Addendum, violation of Section 2.306 of the Texas Business and Commerce Code, and breach of contract. In addition, ISW sought rescission of the MSA and its Addenda and asked the trial court to return the parties "to the position they were in prior to the MSA and its Addenda." ISW also sought the declaratory relief discussed below.

### 1. Declaratory Judgment Regarding the Assignment and Standing

In its first request for declaratory judgment, ISW asked the trial court to declare that: (a) the Assignment Agreement validly transferred and assigned to ISW the MSA and all rights and obligations thereunder; (b) ISW assumed and was assigned the liabilities and obligations of IFI concerning the MSA; (c) the Assignment Agreement irrevocably appointed ISW as IFI's attorney-in-fact, thereby assigning to ISW the right to prosecute and defend litigation concerning the MSA; (d) because IFI assigned the MSA to ISW, ISW had standing to assert the claims in this suit; (e) ISW was the real party in interest in this litigation and had a personal stake in its outcome; (f) ISW was authorized to assert the claims in this lawsuit in its own right as well as on behalf of IFI; and (g) ISW had standing because it produced all the crankshafts.

### 2. Declaratory Judgment Regarding the MSA

Under the heading of "Declaratory Judgment—MSA," ISW asked the trial court to issue a declaratory judgment that (a) the crankshaft failures and the resulting lawsuits, settlements, groundings, and recall, including all resulting damages for losses suffered by Lycoming, were directly caused by Lycoming's negligence; (b) the failures were not caused by the acts or omissions of ISW or IFI; (c) the failures were not caused by performance or defects or the breach of any express or implied warranty of any forgings produced under the MSA; (d) the failures did not relate to "the seller's performance" under the MSA or defects of the crankshaft forgings; (e) Lycoming failed to comply with the notice provisions of the MSA, and this material breach resulted in the MSA's termination; (f) because it failed to follow the MSA's express terms, Lycoming could not enforce the indemnity provisions of the MSA; (g) the agreement to indemnify Lycoming under the MSA was unenforceable as a matter of law, was against public policy, and was a contract of adhesion; and (h) the indemnity agreement was limited to the negligence, if any, "of the seller under the MSA in relation to the forging process and

does not cover" the negligent acts or omissions of Lycoming or other parties under Lycoming's control.

### 3. Trial Amendment

Finally, ISW filed a trial amendment asserting claims for exemplary damages and alleged that, because Lycoming secured the execution of the Second Addendum by deception, the statutory limitation on exemplary damages did not apply.[12]

### K. Pre–Trial and Trial Rulings

Lycoming challenged ISW's standing and capacity to bring its claims, and the trial court granted partial summary judgment, holding that ISW had both standing and capacity. Lycoming does not challenge the partial summary judgment on appeal.

The case was tried between December 6, 2004 and February 15, 2005. Before trial, Lycoming filed a unilateral "stipulation" that it was not seeking indemnification from ISW, but ISW opposed the stipulation. After the start of trial, the court struck the stipulation and refused to allow Lycoming to inform the jury that such a stipulation had been offered. The trial court also excluded documents and testimony offered to show that a division of the FAA attributed the crankshaft failures to overheating.[13] In addition, the trial court excluded evidence that the data Lycoming collected as part of its own root cause investigation of the crankshaft failures included information that overheating of forgings caused similar failures in the engines of a competitor. Lycoming challenges each of these rulings on appeal.

Lycoming also contends the trial court erred in refusing to give certain jury instructions concerning punitive damages, and complains of the trial court's failure to sustain Lycoming's objections to portions of ISW's closing arguments on the grounds of relevance and improper argument.

### L. The Directed Verdict

After ISW completed its case-in-chief, Lycoming successfully moved for a partial directed verdict on several of ISW's claims. ISW appeals the trial court's dismissal with prejudice of ISW's claims under section 2.306 of the Business and Commerce Code.

### M. Jury's Findings

Over Lycoming's objection, the trial court refused to submit separate jury questions concerning IFI and ISW but instead submitted jury questions regarding Lycoming's conduct to "Interstate" and damages "Interstate" incurred. In the charge, "Interstate" was defined to include both ISW and IFI. The trial court further instructed the jury "that the court has determined as a matter of law that [ISW] may bring its claims and the claims of [IFI] against Lycoming, including claims against Lycoming relating to the MSA." The MSA was defined to include both Addenda.

By a vote of ten to two, the jury found that "Lycoming fraudulently induce[d] the extension of the MSA through the Second Addendum to the MSA" and "commit[ted] fraud on Interstate[.]" The jury was then

---

12. Act of May 21, 2001, 77th Leg., R.S., ch. 643, § 3, 2001 Tex. Gen. Laws 1208, 1209, eff. Sept. 1, 2001, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.06, 2003 Tex. Gen. Laws 847, 888–89, *amended by* Act of May 18, 2007, 2007 Tex. Sess. Law Serv. ch. 593, § 3.03 (H.B. 8) (West) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(c)(11) (Vernon Supp.2007)).

13. The excluded evidence includes a certified copy of a report entitled "Lycoming Special Certification Review Team (SCRT) Final Report" ("SCRT Report"), which Lycoming describes as a report by the FAA. The trial court also excluded testimony about the SCRT Report or its conclusions.

asked to find the sum of money that would compensate "Interstate" for damages proximately caused by either act, and was told to limit its finding to two specific categories of damages. First, the jury was asked for "[t]he increase in aviation products liability insurance premiums sustained in the past"; it assessed this amount at $1.7 million. Second, the jury was asked to find the "[r]easonable and necessary expert expenses incurred in the investigation of the crankshaft failures"; it assessed this amount at $2,715,623.17.

The jury also found by clear and convincing evidence that "the harm to Interstate resulted from fraud or malice" [14] and "from a specific intent by Lycoming to cause substantial injury to Interstate[.]" In addition, the jury found that Lycoming secured the execution of the Second Addendum to the MSA by deception, and determined that the reasonable fees for the necessary services of "Interstate's" attorneys was $4,760,027.80 for preparation and trial, $350,000 for an appeal to a court of appeals, $30,000 for filing or responding to a petition for review in the Texas Supreme Court, and $170,000 for briefing and argument on the merits in the Texas Supreme Court. The jury further found that a defect in Lycoming's crankshaft design was the sole cause of the failures.

In separate instructions, the jury was asked to determine the amount that should be assessed against Lycoming and awarded to "Interstate" as exemplary damages. The trial court overruled Lycoming's objections that the charge for exemplary

damages was incomplete and insufficient under the Texas and United States constitutions, and the jury unanimously assessed punitive damages at $86,394,763.

### N. The Judgment

After the jury returned its verdict, ISW submitted a proposed judgment, and the trial court signed the judgment without any change. The court rendered judgment for ISW "for the claims asserted on its own behalf as well as those claims asserted on behalf of [IFI]" in the amounts found by the jury, together with court costs, interest, and contingent awards of attorneys' fees for various appeals. In connection with the jury's findings, the trial court:

1. Rescinded "the indemnification provision of Section 5.3 of the [MSA] and its Addenda, which requires the Seller to indemnify the Buyer" due to "the jury's finding of fraud and fraudulent inducement...." The trial court further held that as a result of the rescission, this provision "cannot be enforced against [ISW], [IFI], or their successors and assigns";

2. Held "that the jury's findings entitle [ISW] to recover the entire amount of exemplary damages awarded by the jury even if it is later found that only nominal actual damages were recoverable";

3. Concluded that, due to the jury's findings, the exemplary damages

---

**14.** At the time this case was filed, "malice" was defined as: (A) a specific intent by the defendant to cause substantial injury or harm to the claimant; or (B) an act or omission: (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109, *amended by* Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7) (Vernon Supp. 2007)).

awarded are not subject to a statutory damage cap; [15] and

4. Found that, based on the jury's factual findings, the award of attorneys' fees and costs are equitable and just as those terms are used in Section 37.009 of the Texas Civil Practice and Remedies Code.[16]

## O. Declaratory Relief

The trial court's rulings concerning ISW's requests for declaratory relief are contained in six numbered paragraphs, which we refer to as Declaratory Judgments 1–6:

1. The Bill of Sale and Assignment Assumption Agreement ("Assignment Agreement") validly assigned the [MSA] to [ISW]; the Assignment Agreement irrevocably appointed [ISW] as [IFI's] attorney-in-fact, with full power to, among other things, initiate legal proceedings in the name of [ISW] or [IFI], and to collect, assert, or enforce any claim or right in connection with any transferred asset, including the [MSA] with [Lycoming], thereby assigning to [ISW], the right to prosecute and defend litigation related to the [MSA] and [IFI]; [ISW] has standing to prosecute and defend claims related to the [MSA]; and [ISW] is authorized to assert the claims in this lawsuit, in its own right as well as on behalf of [IFI].

2. A defect in [Lycoming]'s design of the crankshafts was the sole cause of the crankshaft failures and the resulting service bulletins, airworthiness directives, crankshaft recall and grounding of aircraft with Lycoming engines;

3. Because a defect in [Lycoming's] design of the crankshafts was the sole cause of the crankshaft failures and the resulting service bulletins, airworthiness directives, crankshaft recall and grounding of aircraft with Lycoming engines, [Lycoming] cannot recover, in whole or in part, any losses, liabilities, claims, costs, demands, judgments, penalties, fines, interest, expense or monetary damages of any kind, (including court costs, reasonable fees, expenses and disbursements to attorneys and consultants) (collectively "DAMAGES") that have been, or may be, asserted against, imposed upon, incurred, or suffered by [Lycoming] as a result of any claim or lawsuit (including claims and lawsuits for personal injury and property damage), recall, retrofit, grounding, or government investigation relating in any way to, or arising out of, the crankshaft failures and the resulting service bulletins, airworthiness directives, crankshaft recall and grounding of aircraft with Lycoming engines from [ISW] and/or [IFI] and/or their successors or assigns under the [MSA] or its Addenda, Section 5.3 of the [MSA], or any other legal theory that would impose liability on [ISW] and/or [IFI] and/or their successors or assigns, regardless of whether [Lycoming] asserts the right to recover such DAMAGES, if any, under the common law, case law, stat-

---

**15.** *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(c)(11) (Vernon Supp.2007) (providing an exception to statutory limitations on exemplary damages when the defendant knowingly or intentionally secures the execution of a document by deception).

**16.** *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997) ("[I]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.").

ute, rule or otherwise, including but not limited to claims for contribution, implied or express indemnity, negligence, strict liability or breach of any express or implied contract or warranty. . . .

Using the same broad language, the trial court stated in Declaratory Judgment 4 that, because a design defect was the sole cause of the crankshaft failures, the failures and the consequences of the failures "were not related to or caused by [ISW] and/or [IFI], including any act and/or omission in the forging process and/or the overheating of the steel in the forging process (regardless of whether such act and/or omission constitutes negligence)," and thus, Lycoming could not recover damages under any legal theory. In Declaratory Judgment 5, which also was predicated on the finding that a design defect was the sole cause of the failures, the trial court declared that:

> [The failures] were not related to or caused by: (1) [ISW]'s and/or [IFI]'s and/or the Seller's performance of the MSA or its Addenda; (2) the performance of the crankshaft forgings provided under the MSA or its Addenda . . .; (3) defects (including manufacturing defects) in the crankshafts and crankshaft forgings manufactured or provided to [Lycoming] under the MSA or its Addenda; or (4) [ISW]'s and/or [IFI]'s and/or the Seller's breach of any express or implied warranty for any crankshafts or crankshaft forgings manufactured or provided to [Lycoming] under the MSA or its Addenda. . . .

The trial court again concluded that Lycoming could not recover any damages from IFI or ISW under any legal theory.

In Declaratory Judgment 6, the trial court declared that the indemnification provision in the second paragraph of Section 5.3 of the MSA "is unenforceable as a matter of law because it does not meet the legal requirements for indemnification agreements under Texas or Pennsylvania law. . . ."

This appeal timely ensued.

## II. ISSUES PRESENTED

In a total of twenty-seven issues, Lycoming challenges ISW's standing and the legal sufficiency of the evidence supporting the judgment in virtually all respects.[17] Lycoming also challenges the attorneys' fees award; contends the actual damages are not legally cognizable; and alleges that the punitive damage award exceeds constitutional bounds. Finally, Lycoming asserts various evidentiary and jury charge errors. In two cross-points, ISW challenges the directed verdict on its claim for breach of contract. We address only those issues that are dispositive of this appeal. TEX.R.APP. P. 47.1.

## III. STANDING

Before reaching the merits of this appeal, we must address issues of standing. In its first issue, Lycoming contends that ISW lacks standing to assert any of the claims at issue because ISW is not a party to the MSA or its Addenda. In its third issue, Lycoming argues that ISW lacks standing to sue Lycoming on its own behalf because Lycoming offered a formal stipulation before trial that it had never and would never seek indemnification from ISW for the crankshaft failures. Lycoming similarly argues in its sixteenth issue[18] that ISW lacks standing to pursue its

---

17. Issues are discussed in the order reached; issues we do not reach are enumerated in the attached Appendix.

18. Lycoming's issues were independently numbered under several headings; for clarity, however, we refer to the issues as if they were numbered in a single continuous list.

claims for declaratory relief because the offered stipulation eliminated any dispute or basis for granting ISW relief.

### A. Governing Law

 A party's standing to pursue a cause of action is a question of law we review de novo. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998); *Emmett Props., Inc. v. Halliburton Energy Servs., Inc.,* 167 S.W.3d 365, 371 (Tex. App.-Houston [14th Dist.] 2005, pet. denied). The general test for standing in Texas requires that there be a real controversy between the parties that will be actually determined by the judicial declaration sought. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex. 1993). Specifically, a plaintiff has standing to sue if: (1) the plaintiff has sustained, or is immediately in danger of sustaining, some direct injury as a result of a complained-of wrongful act; (2) there is a direct relationship between the alleged injury and the claim asserted; (3) the plaintiff has a personal stake in the controversy; (4) the challenged action has caused the plaintiff some injury in fact; or (5) the plaintiff is an appropriate party to assert both its own interest and the public interest in the matter. *El Paso Cmty. Partners v. B&G/Sunrise Joint Venture,* 24 S.W.3d 620, 624 (Tex.App.-Austin 2000, no pet.).

 Generally, the pleader must allege facts that affirmatively demonstrate the court's jurisdiction to hear the case. *In re Forlenza,* 140 S.W.3d 373, 376 (Tex. 2004) (orig. proceeding). The alleged injury must be concrete, particularized, fairly traceable to the defendant's allegedly unlawful conduct, and likely to be redressed by the requested relief. *Brown v. Todd,* 53 S.W.3d 297, 305 (Tex.2001). In reviewing the trial court's ruling on the issue of standing, we construe the pleadings in the plaintiff's favor and consider the pleader's

intent. *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002). In addition, courts "may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex.2000).

 Standing is not to be confused with capacity. "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 661 (Tex. 1996). Capacity concerns "a party's personal right to come into court," while standing concerns "the question of whether a party has an enforceable right or interest." *Austin Nursing Ctr., Inc. v. Lovato,* 171 S.W.3d 845, 849 (Tex.2005) (quoting 6A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1559, at 441 (2d ed.1990)). Thus, a plaintiff with no legally cognizable interest in the outcome of the case lacks standing to sue on its own behalf, but may be authorized to sue on behalf of another. *See Nootsie,* 925 S.W.2d at 661; *see also Neeley v. W. Orange–Cove Consol. Indep. Sch. Dist.,* 176 S.W.3d 746, 776 (Tex.2005) ("[A] party's standing to assert a claim does not depend on its ability or willingness to look out for interests other than its own.").

### B. Pleadings at Issue

Because our analysis of standing begins with the plaintiff's pleadings, we must first address Lycoming's argument concerning *which* pleadings are determinative. In its fourteenth issue, Lycoming argues that the Texas trial court should have refused to exercise jurisdiction over ISW's amended claim for declaratory judgment inter-

preting the MSA and its Addenda because, by the time the amended petition was filed, ISW's requests for declaratory relief addressed claims that were already pending in the Pennsylvania actions.[19] In substance, Lycoming asks us to treat the Pennsylvania actions as "first-filed" suits with regard to ISW's requests for declaratory judgments.

Here, ISW originally filed suit first for breach of contract, contribution, contractual indemnity, and declaratory judgment regarding the MSA.[20] The original petition incorporated the MSA and its Addenda by reference, but as Lycoming correctly points out, ISW is not a party to these agreements. This is shown by the documents themselves, and because these documents are incorporated by reference in the petition, the face of the pleading shows that ISW is not a party to these agreements. *See Cockrell v. Estevez*, 737 S.W.2d 138, 141 (Tex.App.-San Antonio 1987, no writ) ("When an inspection of an exhibit referred to in the pleadings shows facts contradictory to the pleadings, the exhibit, not the allegation of the pleadings, must control."). Moreover, the documents show that IFI's duties under the contract cannot be delegated to ISW without Lycoming's prior written consent, and ISW did not initially allege that such consent had been obtained or waived.

As noted, before ISW amended its petition, Lycoming had filed its Pennsylvania lawsuits. Lycoming therefore argued that ISW lacked standing to prosecute its declaratory judgment claims because, *inter alia*, those claims were primarily defenses to Lycoming's Pennsylvania claims. On appeal, Lycoming supports this argument with a statement made by this court when the case was last before us:

> Regarding choice of forum, Texas courts generally favor the plaintiff's choice when deciding intrastate venue questions. However, the mere fact that a plaintiff chose a Texas forum and the defendant subsequently filed a mirror image suit in a sister state does not by itself support issuance of an anti-suit injunction; both suits may continue unabated. Additionally, in the present case, many of ISW's claims are *defensive* in nature, seeking declaratory judgment that would defeat Lycoming's affirmative claims. The nature of ISW's claims weighs against a general policy favoring a Texas venue.

*AVCO*, 145 S.W.3d at 266 (citations omitted). Lycoming relies on the quoted language and on cases holding that "[t]he Declaratory Judgments Act is 'not available to settle disputes already pending before a court.'" *BHP Petroleum Co., Inc. v. Millard*, 800 S.W.2d 838, 841 (Tex.1990) (quoting *Heritage Life Ins. Co. v. Heritage Group Holding Corp.*, 751 S.W.2d 229, 235 (Tex.App.-Dallas 1988, writ denied); *see also Abor v. Black*, 695 S.W.2d 564, 566 (Tex.1985) (stating that the trial court should not exercise jurisdiction over a suit for declaration of non-liability by a potential negligence defendant); *Space Master Int'l, Inc. v. Porta–Kamp Mfg. Co., Inc.*, 794 S.W.2d 944, 948 (Tex.App.-Houston

19. Specifically, Lycoming asks, "Does Texas law bar ISW's 'defensive' declaratory judgment claim on the indemnity issue in this case because ISW asserted that claim on behalf of IFI only *after* Lycoming had filed its suit against IFI seeking indemnity and raising the same issues in Pennsylvania?"

20. ISW also alleged business disparagement regarding ISW's "performance of the forging process," and claimed that Lycoming disparaged "the general character of its business...." These claims were subsequently abandoned, and the question of ISW's standing to assert such a claim is not before us. *See Westgate, Ltd. v. State*, 843 S.W.2d 448 (Tex.1992) (sub. op.) ("It is a party's request for jury issues and instructions, not its pleadings, that determine whether a cause of action is preserved.").

[1st Dist.] 1990, no writ) (noting that a trial court may properly dismiss a suit for declaratory judgment when the court's exercise of jurisdiction would "deprive the plaintiff of the ability to select the appropriate forum" to hear the case); *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 n. 3 (5th Cir.1983) ("Anticipatory suits are disfavored because they are an aspect of forum-shopping.")).

 Assuming that a plaintiff's request for defensive declaratory relief raises questions of standing,[21] this argument does not apply here. Unlike the parties in the cases on which Lycoming relies, the parties are not the same in the various lawsuits at issue here. *Cf. Hawkins v. Tex. Oil & Gas Corp.*, 724 S.W.2d 878, 891 (Tex.App.-Waco 1987, writ ref'd n.r.e.) (stating that a trial court should refuse to entertain a declaratory judgment action if another action is pending involving the same parties and in which the same issues may be adjudicated). Moreover, ISW's claims for declaratory judgment were not pending in another court when the Texas suit was filed; ISW filed this lawsuit before Lycoming sued IFI and Citation in Pennsylvania, and when Lycoming challenged ISW's standing, ISW amended its pleadings to assert additional jurisdictional facts. Lycoming did not specially except, object, or move to strike the amended pleading, which effectively relates back and replaces the original pleadings of ISW's first-filed suit. *See* TEX.R. CIV. P. 65 (a substituted pleading takes the place of the prior pleading); *Brown*, 80 S.W.3d at 555 (stating that if the petition does not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff

should be afforded the opportunity to amend); *Tex. Ass'n of Bus.*, 852 S.W.2d at 446 (noting that litigant can amend pleadings to allege facts conferring standing); *see also Lovato*, 171 S.W.3d at 852 (post-limitations substitution of a plaintiff asserting the same cause of action in a different capacity relates back).[22]

We therefore overrule Lycoming's fourteenth issue, and we determine whether ISW has standing to pursue the adjudicated claims asserted in its Sixth Amended Original Petition and First Trial Amendment.

### C. ISW's Claims Considered Separately from IFI's Claims

 In considering ISW's claims, we are mindful that a plaintiff may have standing to litigate some of the claims raised but lack standing to litigate others. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 392 (Tex.2000) (holding that the plaintiff had standing to litigate all of his asserted claims with the exception of claims requiring consumer status); *Mazon Assocs., Inc. v. Comerica Bank, Tex.*, 195 S.W.3d 800, 803 (Tex.App.-Dallas 2006, no pet.) ("The determination of whether a plaintiff possesses standing to assert a particular claim depends on the facts pleaded and the cause of action asserted." (quoting *Everett v. TK–Taito, L.L.C.*, 178 S.W.3d 844, 853 (Tex.App.-Fort Worth 2005, no pet.))). We are required to dismiss only those claims over which we lack jurisdiction. *Thomas v. Long*, 207 S.W.3d 334, 338–39 (Tex.2006). Thus, we consider the adjudicated claims separately to determine whether ISW possessed standing for each. *See Casteel*, 22 S.W.3d at 392; *SCI*

---

21. We express no opinion on this issue.

22. We further note that if Lycoming's argument were correct, then this court would have been obliged to dismiss ISW's declarato-

ry judgment claims based on the absence of standing when the case was previously before us on appeal. Instead, we expressly stated that the Texas suit could continue. *AVCO*, 145 S.W.3d at 266.

*Tex. Funeral Servs., Inc. v. Hijar,* 214 S.W.3d 148, 153 (Tex.App.-El Paso 2007, pet. denied) (op. on reh'g) ("When standing is placed at issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication *of a particular issue* and not whether the issue itself is justiciable.") (emphasis added) (citing *Flast v. Cohen,* 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968)).

## D. Extent of Standing

### 1. Declaratory Judgment

 Lycoming correctly points out in its first issue that ISW is not a party to the MSA or its Addenda, and argues that ISW therefore lacks standing to seek declaratory judgment regarding these agreements. We disagree. Reviewing the jurisdictional evidence de novo, we note that the first paragraph of section 5.3 of the MSA provides that Lycoming must indemnify IFI and IFI's affiliates and hold them harmless from losses and costs incurred by IFI in certain circumstances. Here, ISW is an affiliate of IFI and a potential indemnitee under the terms of the MSA. *See Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993) (stating that an indemnity agreement "creates a potential cause of action in the indemnitee against the indemnitor"). In addition, the Assignment Agreement requires ISW to indemnify IFI, and Lycoming has requested indemnity from IFI. Thus, ISW has a justiciable interest in determining the validity and effect of the indemnity provisions of the MSA. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.004 (Vernon Supp.2007) (a person "interested" under a written contract or whose rights are affected by a contract may have questions of contract construction or validity determined by the court); *cf. Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939–40 (Tex.1991) (" '[A] party to or interested in a contract may, by legal proceedings or otherwise in good faith, interfere with the execution of the contract where there is a bona fide doubt as to his rights under it.' " (quoting *Hardin v. Majors,* 246 S.W. 100, 102 (Tex.Civ.App.-Amarillo 1922, no writ))).

We conclude that, as IFI's affiliate and potential indemnitor and as Lycoming's potential indemnitee, ISW has standing to seek declaratory relief on behalf of both IFI and ISW. Our analysis is not affected by Lycoming's argument that it eliminated the justiciable controversy between the parties—and thus, ISW's standing—by offering to stipulate that Lycoming would not seek indemnification from ISW. Because ISW's asserted claims are not dependent on allegations that Lycoming may seek indemnification directly from ISW, its standing is not affected by Lycoming's proposed unilateral stipulation.[23] We therefore overrule Lycoming's sixteenth issue, and we overrule its first and third and issues as they pertain to ISW's requests for declaratory judgment.

### 2. Tort Claims

#### a. Claims Asserted on Behalf of IFI

 In its pleadings, ISW alleges, *inter alia,* that it asserts IFI's claims as IFI's attorney-in-fact pursuant to the Assignment Agreement. Lycoming argues that ISW fails to satisfy the conditions under which an agent has standing to maintain a suit in its own name. However,

---

23. *See also Phillips v. Wertz,* 546 S.W.2d 902, (Tex.Civ.App.-Dallas 1977, writ ref'd n.r.e.) (stating that "the attempted unilateral 'stipulation' by defendants' counsel that defendants would not violate the court's order [does not] constitute proof that defendants would discontinue their attempts to use the land" and holding that plaintiff was entitled to a permanent injunction restraining defendants from using the disputed property).

the cases on which Lycoming relies are distinguishable in that the agents in those proceedings prosecuted or defended actions solely in their own names but not on behalf of the principal. *See, e.g., Perry v. Breland,* 16 S.W.3d 182, 187 (Tex.App.-Eastland 2000, pet. denied) (car dealer's agent brought suit in his own name; no indication he sued on behalf of dealer); *Wilson County Peanut Co. v. Hahn,* 364 S.W.2d 468, 470 (Tex.Civ.App.-San Antonio 1963, no writ) (holding that seed purchaser lacked standing to sue seller's agent); *Tinsley v. Dowell,* 87 Tex. 23, 27–28, 26 S.W. 946, 948 (1894) (holding that real estate agent who brought suit in his own name lacked standing to sue land purchaser who failed to complete transaction); *see also Emmett Props., Inc.,* 167 S.W.3d at 371 (holding that intervening stockholders did not have an independent right to bring action for damage to corporation's property and noting that stockholders did not intervene on behalf of the corporation); *cf. Wilkinson v. Wilkinson,* 956 S.W.2d 821, 822–23 (Tex.App.-Houston [1st Dist.] 1997) (holding that mother who did not bring suit as next friend had standing to assert minor son's right to an accounting because she pleaded her status as managing conservator), *op. withdrawn on reh'g,* No. 01–96–00219–CV, 1998 WL 175885 (Tex.App.-Houston [1st Dist.] April 2, 1998, no pet.) (prior opinion rendered moot when minor son reached the age of eighteen). Here,

ISW specifically pleaded that it asserted claims on IFI's behalf, and Lycoming does not dispute that IFI has a justiciable interest in these claims.

In addition, the Assignment Agreement authorizes ISW to bring suit in its own name to assert certain claims on IFI's behalf. The scope of that authority is a question of capacity,[24] and no challenge to ISW's capacity is before the court on appeal.

We therefore agree with ISW that it has standing as IFI's attorney-in-fact to litigate IFI's tort claims.[25] We conclude that ISW has standing to assert IFI's tort claims as IFI's putative attorney-in-fact; thus, we do not reach the remaining bases for ISW's standing to assert IFI's tort claims.

### b. Claims Asserted on Behalf of ISW

Lycoming also contends that ISW lacks standing to assert its own claims of fraud and fraudulent inducement because ISW is neither a party nor a third-party beneficiary to the Second Addendum, and therefore cannot be the party defrauded.[26] In support of this argument, Lycoming relies in part on *Nobles v. Marcus,* in which the Texas Supreme Court stated:

> It is a fundamental rule of law that only the person whose primary legal right has been breached may seek redress for

---

24. *See Nootsie,* 925 S.W.2d at 661 (stating that the legal authority to act is a question of capacity).

25. Because Lycoming waived its challenge to ISW's capacity, we need not determine, before reaching the merits of the appeal, whether the scope of ISW's authority actually encompasses the claims it asserts on IFI's behalf.

26. This issue is not resolved by our conclusion that ISW has standing as IFI's attorney-in-fact to assert IFI's tort claims, because we

determine a party's standing to pursue claims on its own behalf separately from its standing to pursue claims as a representative. *See Elizondo v. Tex. Natural Res. Conservation Comm'n,* 974 S.W.2d 928, 931–32 (Tex.App.-Austin 1998, no pet.) (holding that plaintiff lacked standing to sue in her individual capacity); *cf. El T. Mexican Rests., Inc. v. Bacon,* 921 S.W.2d 247, 251–52 (Tex.App.-Houston [1st Dist.] 1995, writ denied) (capacity but not standing to sue devolves upon shareholders of incapacitated corporation; thus, shareholders must sue as representatives of the corporation).

an injury.... Without breach of a legal right belonging to the plaintiff[,] no cause of action can accrue to his benefit.... A party who was not defrauded by the conveyance has not suffered an invasion of a legal right and therefore does not have standing to bring suit based on that fraud.

533 S.W.2d 923, 927 (Tex.1976). Here, however, ISW alleges in its live pleadings that "IFI and ISW provided Lycoming with direct and constructive notice" that IFI had transferred the MSA and the forging facilities to ISW. ISW further alleges that IFI executed the Second Addendum on ISW's behalf. After construing the pleadings liberally and considering the pleader's intent, we conclude that ISW has alleged sufficient facts to confer standing to assert its claims of fraud and fraudulent inducement.

■■■■■■ Finally, Lycoming asserts that ISW lacks standing because neither ISW nor IFI suffered actual injury as a result of the fraudulent conduct alleged. But causation and damage are matters of proof, and the determination of standing does not require a plaintiff to "put on its case" simply to establish jurisdiction. *See Bland Indep. Sch. Dist.*, 34 S.W.3d at 554. In determining standing, "a court may not weigh the claims' merits but must consider only the plaintiffs' pleadings and the evidence pertinent to the jurisdictional inquiry." *Brown*, 80 S.W.3d at 555. Consideration of causation and damages goes beyond the jurisdictional inquiry and into the merits of the claims; but if a party lacks standing to assert a claim, the trial court has no jurisdiction over the merits, and the cause of action must be dismissed, leaving the merits undecided. *Bell v. Moores*, 832 S.W.2d 749, 753–54 (Tex.App.-Houston [14th Dist.] 1992, writ denied).

Because review of such matters would require consideration of evidence discussed *infra* that "goes to the heart of the mer-its," we recognize ISW's standing to pursue its claims to judgment. *See CHCA E. Houston, L.P. v. Henderson*, 99 S.W.3d 630, 633–34 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (finding standing for a putative successor-in-interest to assert a claim for breach of contract because "deciding who should pay whom on a contract goes to the heart of the merits, while standing is generally a question of law to be determined by the court from the pleadings"). We overrule the remainder of Lycoming's first and third issues.

## IV. LEGAL SUFFICIENCY OF FRAUD DAMAGE EVIDENCE

### A. Standard of Review

In its eighth issue, Lycoming challenges the legal sufficiency of the evidence supporting the actual damages the jury found were caused by Lycoming's fraud or fraudulent inducement. To determine whether the evidence is legally sufficient to support the judgment, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). We assume that jurors decided questions of credibility or conflicting evidence in favor of the verdict if they reasonably could do so. *Id.* at 819, 820. We do not substitute our judgment for that of the trier-of-fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822. If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then it is legally sufficient to support the verdict. *Id.*

### B. Insufficient Evidence of Harm

The jury was advised that, to find Lycoming liable for fraud or fraudulent inducement, it must find that "Interstate"

was injured as a result of its reliance on Lycoming's misrepresentations or non-disclosures. But the only damages the jury found were caused by Lycoming's fraudulent conduct are (1) the increase in aviation products liability insurance premiums sustained in the past, and (2) reasonable and necessary expert expenses incurred in the investigation of the crankshaft failures. For the reasons stated below, we conclude that neither category of damages is recoverable by ISW on its own behalf or on behalf of IFI.[27]

### 1. Increased Aviation Products Liability Insurance Premiums

■ On appeal, Lycoming argues that the record does not support an award of actual damages consisting of the unreimbursed increase in "Interstate's" aviation products liability insurance premiums, and moreover, such damages are not legally cognizable. ISW contends that the increase in insurance premiums was foreseeable and directly traceable to Lycoming's fraud.

The evidence in support of this damage award consists almost entirely of the testimony of Ed Buker, who is the president and CEO of Citation and the chairman of both IFI and ISW. Buker testified that the insurance premiums increased because "Interstate" made an insurance claim in the summer of 2002 as a result of Lycoming's demand for indemnity. Specifically, Buker testified that the insurance premiums were $90,000 in June 2002, $795,000 in November 2002, $1.175 million in November 2003, and $1.051 million in November 2004. At trial, ISW argued that this amounted to a $2.7 million increase in insurance premiums above the $90,000 baseline. According to Buker, "Interstate" passed on $1 million of this increase to Lycoming by increasing the price of crankshaft forgings produced pursuant to the Replacement Crankshaft Agreement, leaving an unreimbursed insurance premium increase of $1.7 million.

We conclude there is legally insufficient evidence to support this damage award. Initially, we note there is no evidence that Lycoming's demand for contractual indemnity would have been a covered claim under the relevant insurance policy.[28] Moreover, Buker testified only that the insurance premiums increased after "Interstate" informed its insurer of Lycoming's claim for indemnity, but in our review of the record, we have not discovered evidence indicating when this demand was made. Although the record contains Lycoming's demands for indemnity from IFI in connection with the forgings that were not heat-treated, this claim was settled,

---

**27.** On appeal, ISW adds that it was injured because it was named as a defendant in the *Flying Frog* litigation. But the plaintiffs in that suit named IFI, not ISW, as a co-defendant with Lycoming. In support of its statement that ISW was a defendant in *Flying Frog*, ISW cites correspondence in which its attorney asked Lycoming's attorney to substitute ISW for IFI in a settlement and release agreement. This correspondence is dated June 9, 2003—two years after the Second Addendum was executed, over a month after this suit was filed, and more than two weeks after Lycoming filed suit against IFI in Pennsylvania. Moreover, ISW's attorney represented to the trial court that "Interstate" did not settle with the *Flying Frog* plaintiffs. And regardless of whether IFI or ISW was named as a defendant in *Flying Frog*, we see no basis on which to consider this an injury caused, directly or indirectly, by fraud or a fraudulently-induced execution of the Second Addendum on behalf of IFI or ISW. *Cf. Butler v. Morgan,* 590 S.W.2d 543, 545 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.) (holding that a plaintiff claiming malicious prosecution fails to allege damage "conforming to legal standards" because the damage "flowed, directly or indirectly, from the fact that suit was filed").

**28.** The policy at issue is not in the record, and there is no evidence of the carrier's coverage position.

and was not at issue in this lawsuit. The record also reflects Lycoming's demands for indemnity as asserted in the Pennsylvania actions against IFI and Citation, but those demands were made after this suit was filed and after "Interstate's" insurance premiums had increased. In our review of the record, we have discovered no evidence that Lycoming demanded indemnity from ISW, and no acts by Lycoming that would result in an increase in "Interstate's" insurance premiums in the summer of 2002.

■ In addition, Buker's testimony does not link the premium increase with Lycoming's fraudulent conduct; instead, his testimony indicates he simply inferred that the premiums were increased because "Interstate" informed its insurer that Lycoming requested indemnity. But damages "cannot be based on mere speculation and hypothesis." *McMillin v. State Farm Lloyds,* 180 S.W.3d 183, 202 (Tex.App.-Austin 2005, pet. denied) (citing *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 49–50 (Tex.1998)). ISW bore the burden to establish that Lycoming's fraud or fraudulent inducement caused damages, not that Lycoming's demand for indemnity was harmful. And ISW produced no evidence that the premium increase was the result of Lycoming's fraud or of the fraudulently-induced Second Addendum.[29]

There also is no evidence that a premium increase was foreseeable. In fact, IFI successfully negotiated for the deletion of the provision in the MSA that would have required IFI to maintain insurance. And it is uncontroverted that the same policy

insured an affiliated company, Rancho Cucamonga, which also manufactured aviation products. Indeed, ISW offered uncontroverted testimony that Citation is the policyholder, and the policy affords coverage to Citation and all of its subsidiaries.[30]

Finally, it is uncontroverted that the premiums were paid by Citation. Citation is not a party to the MSA, its Addenda, or this lawsuit, and ISW asserted no claims on Citation's behalf. Thus, there is no evidence to support the award of damages to ISW, on its own behalf or on behalf of IFI, for Citation's increased aviation products liability insurance premiums.

Lycoming argues that the absence of evidence tracing the premium increase to Lycoming's conduct illustrates one of the primary problems with recognizing such a category of damages: increased insurance premiums result from many concurring factors, including market forces and the internal financial practices of the carrier. *See Higbie Roth Constr. Co. v. Houston Shell & Concrete,* 1 S.W.3d 808, 812–13 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) (citing *Whirley Indus., Inc. v. Segel,* 316 Pa.Super. 75, 82, 462 A.2d 800, 804 (1983) (per curiam));[31] *cf. Moiel v. Sandlin,* 571 S.W.2d 567, 571 (Tex.Civ.App.-Corpus Christi 1978, no writ) (stating that the increased insurance premiums in a malicious prosecution case are "more analogous to a prepayment for attorney's fees and expenses incurred in defending ... cases which are an incident of defending any civil suit .... [and are] not necessarily attributable solely" to the defendant's wrongful suit). ISW argues that "Interstate's premiums rose *solely* because of

---

**29.** Most of the failures occurred in engines using crankshafts made from earlier forgings produced pursuant to the original MSA.

**30.** Buker testified that Rancho Cucamonga made no claims, and that the various Citation companies followed an internal accounting

practice that charged the premiums to ISW and Rancho Cucamonga. There is no evidence that Lycoming made a demand for indemnity from either of these companies.

**31.** In the body of the *Whirley* opinion, the appellees' names are spelled Segal.

Lycoming's indemnity claim—excluding the influence of any market factors." But the record contains no evidence concerning these factors or the carrier's assessment of risk posed by any of the various companies covered by the policy.

Even assuming that the premium increases were linked to Lycoming's demand for indemnity, the record contains no evidence that Lycoming's fraud or fraudulent inducement was the cause of the premium increase. Instead, the uncontroverted evidence establishes that the policy and the premiums were the responsibility of Citation, and there is no allegation that Lycoming defrauded Citation. To the contrary, Citation's interests are not at issue in this case. Because we conclude there is less than a scintilla of evidence that Lycoming's fraudulent conduct injured ISW or IFI by causing them increased aviation products liability insurance premiums, we do not reach Lycoming's argument that "opening the door to these damages would enter a field with no sensible stopping point." *See Vogel v. Liberty Mut. Ins. Co.,* 214 Wis.2d 443, 451, 571 N.W.2d 704, 708 (Wis.App.1997).

### 2. *Expert Witnesses' Fees*

■ Lycoming also contends that the fees paid to expert witnesses whose work was performed in preparation for litigation are not recoverable as damages. *See Stanley Stores, Inc. v. Chavana,* 909 S.W.2d 554, 563 (Tex.App.-Corpus Christi 1995, writ denied) (holding the trial court erred in making an equitable award of expert witness fees absent statutory authorization); *Richards v. Mena,* 907 S.W.2d 566, 571 (Tex.App.-Corpus Christi 1995, writ dism'd by agr.) (holding that costs of experts "are incidental expenses in preparation for trial and not recoverable" as court costs regardless of good cause shown); *King v. Acker,* 725 S.W.2d 750, 755 (Tex.App.-Houston [1st Dist.] 1987, no writ) (holding that prevailing party "can-

not recover the costs of handwriting experts [as actual damages because] ... [t]hese are litigation expenses ..."). ISW contends that these fees are investigative expenses recoverable as fraud damages, and although it cites no binding precedent in support of this argument, it relies on the following cases.

#### a. *Holmes v. P.K. Pipe & Tubing, Inc.*

ISW first refers us to *Holmes v. P.K. Pipe & Tubing, Inc.* 856 S.W.2d 530, 543 (Tex.App.-Houston [1st Dist.] 1993, no writ). In *Holmes,* the defendant leased property contaminated with chemical waste to the plaintiff for storing pipe, and the lease required the plaintiff to restore the site to its pre-lease condition. *Id.* at 532–34. The defendant did not disclose the existence of the contamination, and the plaintiff stored approximately seven million pounds of pipe directly over the covered waste. *Id.* at 534. The Texas Water Commission required the pipe to be removed and the land restored, and the plaintiff hired Carden, an environmental engineer, to inspect the site, review compliance plans, and act as a liaison with the Commission. *Id.* at 535. The First Court of Appeals held that "in light of the defendant's misrepresentations, the trial court did not err in awarding damages for expenses incurred in hiring environmental engineer Carden, removing the pipe from the cap, and remediating the site." *Id.* at 543.

Unlike the present case, the *Holmes* court did not indicate that the engineer testified or that his work was essential to maintain the action. *See id.* at 535 (stating that the expert "did not testify about the contents of his report or about any recommendations he made to the joint venture"). Moreover, Carden's work in assisting to remediate the site was not a litigation expense, but was more in the nature of re-

pair. *See Stearman v. Centex Homes,* 78 Cal.App.4th 611, 625, 92 Cal.Rptr.2d 761, 771 (2000) (reversing judgment that omitted fees incurred by experts to analyze soil and perform design calculations necessary to create repair plan). Unlike the experts in *Holmes* and *Stearman,* the experts here were not retained to repair or remediate any property owned or leased by the plaintiff, but to prove the plaintiff's "non-liability."[32]

### b. *Jackson v. Julian*

ISW next relies on *Jackson v. Julian,* 694 S.W.2d 434 (Tex.App.-Dallas 1985, no writ). In *Jackson,* the defendant physician allegedly misrepresented to the patient that another doctor had removed her ovary. The patient sued for fraud, alleging that she justifiably relied on the misrepresentation and "employed an attorney . . . to identify the doctor who removed the right ovary without her permission." *Id.* at 437. The trial court dismissed the cause of action for constructive fraud, in part because the patient stated no damages. The Fifth Court of Appeals reversed, stating that "[i]t may be inferred from this allegation that she would not have hired an attorney if the doctor had not made the alleged misrepresentation. Thus, her pleadings sufficiently lay the predicate that her reliance caused her to incur attorney's fees." *Id.* at 437. The court further stated, "Since the patient seeks to recover the expense incurred in hiring an attorney to investigate the other doctor, *as distinguished from the cost of prosecuting her action against Dr. Julian,* we hold that such investigative expense may be found to be proximately resulting from the doctor's alleged misrepresentations." *Id.* (emphasis added).

Again, there is no indication that the attorney testified at trial. *See id.* In

contrast to the expert in *Jackson,* the experts here were not engaged to identify a proper party, but to defend against actual or foreseeable claims for indemnity. And also unlike the expert in *Jackson,* the work of ISW's experts formed the core of the litigation. *See Prairie Producing Co. v. Angelina Hardwood Lumber Co.,* 885 S.W.2d 640, 640–41 (Tex.App.-Beaumont 1994, writ denied) (op. on reh'g) (clarifying that fees for expert testimony and opinion essential to maintain a party's position in one lawsuit are not recoverable as actual damages in another lawsuit).

### c. *United States ex rel. Wilkins v. North American Construction Corp.*

In addition, ISW directs us to *United States ex rel. Wilkins v. North American Construction Corp.* 173 F.Supp.2d 601, 647 (S.D.Tex.2001) (amended mem. op.). In this suit under the qui tam provisions of the False Claims Act,[33] the federal government alleged the injury and reliance elements of common-law fraud. *Id.* at 645. The government claimed it incurred investigative expenses in reliance on the contractors' false certification that their Request for Equitable Adjustment ("REA") was made in good faith. *Id.* at 646. The court held that the government adequately alleged injury and reliance because the government was required by the Federal Acquisition Regulation to investigate such certified claims. *Id.* at 647.

The analogous statutory duty in this case is not borne by ISW, but by the National Transportation Safety Board, which is required to investigate each civil aircraft "accident." *See* 49 U.S.C.A. § 1132(a) (2007). Unlike the present case, the misrepresentation in *Wilkins* directly triggered the government's statutory obligation to investigate the claim. The *Wilkins* court cited the standard for common-

---

**32.** As Buker testified, "I'm seeking relief that shows that it's not my fault so I don't have any reason to have any liability, Counsel."

**33.** 31 U.S.C.A. §§ 3729–3730 (2003).

law consequential fraud damages as set forth in *Arthur Andersen & Co. v. Perry Equipment Corp.*,[34] and relying on *Jackson v. Julian*, concluded that investigative expenses may be consequential damages. *Id.* As previously noted, however, the *Jackson* court distinguished expert fees incurred in prosecuting the case.

### d. *Versaggi Shrimp Corp. v. United States*

Finally, ISW relies on *Versaggi Shrimp Corp. v. United States*, another case under the False Claims Act. *See* 28 Fed.Cl. 20, 22 (1993). There, the Court of Federal Claims ordered the plaintiff to reimburse the government's costs of investigating a fraud because "damages associated with the vindication of a common law right may include the costs of a related fraud investigation." *Id.* at 26. In support of this conclusion, the court relied solely on *Continental Management, Inc. v. United States. See* 527 F.2d 613, 618, 208 Ct.Cl. 501 (1975) (holding that proof that government officials were bribed is sufficient to prove that the government was injured). In *Continental Management*, the court noted that bribery of officials diminishes the public's confidence in the government, and stated, "The Government likewise incurs the administrative costs of firing and replacing the venal employees and the costs of investigation, all of which are compensable in fraud cases." *Id.*

As authority for this statement, the court relied on *United States v. Rex Trailer Co.*, 218 F.2d 880, 884 (7th Cir.1955) ("It is well settled that in addition to actual losses[,] the *government* is entitled to re-

imbursement of costs in connection with ferreting out and investigation of the frauds.") (emphasis added), *aff'd on other grounds*, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956) (upholding award authorized under the Surplus Property Act). *Rex Trailer* in turn relied on *Helvering v. Mitchell. See* 303 U.S. 391, 401, 58 S.Ct. 630, 634, 82 L.Ed. 917 (1938). There, the United States Supreme Court explained:

> The remedial character of *sanctions* imposing additions to a tax has been made clear by this Court in passing upon similar legislation. They are provided primarily as a safeguard for the protection of the revenue and to *reimburse the Government for the heavy expense of investigation* and the loss resulting from the taxpayer's fraud.

*Id.* (emphasis added).

The *Rex Trailer* court also relied on *Stockwell v. United States*, 80 U.S. 531, 547, 13 Wall. 531, 547, 20 L.Ed. 491 (1871) (holding that the Act of March 3, 1823 allowing the federal government to maintain a civil action for double the value of illegally imported goods is remedial and not penal). In *Stockwell*, the Court stated:

> The act of abstracting goods illegally imported, receiving, concealing, or buying them, interposes difficulties in the way of a government seizure, and impairs, therefore, the value of the government right. It is, then, hardly accurate to say that the only loss the government can sustain from concealing the goods liable to seizure is their single value, or to assert that the liability imposed by the statute of double the value is arbitrary and without reference to indemni-

**34.** 945 S.W.2d 812, 816 ("Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. Under the common law, consequential damages need not be the usual result of the wrong, but must be foreseeable, and must be directly traceable to the wrongful act and result from it.") (citations omitted);

*see also Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex.1998) (per curiam) (stating that consequential damages in a contract action "are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach").

fication. Double the value may not be more than complete indemnity.

*Id.*

Thus, the line of cases on which *Versaggi Shrimp* relies concerns the federal government's right to recover enhanced damages, and derives from cases that originally allowed the costs of investigations as sanctions or exemplary damages under federal statutes. This line of cases does not stand for the proposition that, in the absence of an authorizing statute, a private limited partnership suing for state common-law fraud may recover as actual damages the fees and expenses of expert witnesses whose work and testimony were used at trial and were essential to prove its claims.[35] In sum, none of the cases on which ISW relies constitute precedent binding on this court, and all of the cases are distinguishable.

### e. Evidence Regarding ISW's Expert Fees

Finally, we find no evidence in the record to distinguish the expert fees incurred in this case from any other expert fees incidental to litigation. To the contrary, the evidence demonstrates that ISW's experts were engaged to provide the proof supporting the "non-liability" declaration ISW requested in its live pleadings. This is most evident in the testimony of Ed Buker.

Buker testified that he "directed the filing of this lawsuit in [his] various roles for Citation" including his roles as president and CEO of Citation and chairman of ISW. He described the purpose of the litigation as follows:

Q: So, this lawsuit was filed, was it not, sir, by [ISW] in order to attempt to protect [IFI] from possible claims by Lycoming? That was the purpose of this lawsuit, wasn't it, sir?

A: *My intention on filing this lawsuit was to get enough data and information to find the root cause of the problem and prove that it was not any part of Citation's fault,* because I couldn't get data from Lycoming any other way.[36]

Q: So, your testimony is that you filed the lawsuit in order to conduct an investigation?

A: We began the investigation. *I wanted the data that Lycoming had to help find the root cause of the problem which Lycoming has still not proven to me.*

. . .

Q: You're not seeking any relief for-to allow you to conduct an investigation, are you?

A: *I'm seeking relief that shows that it's not my fault so I don't have any*

---

**35.** ISW additionally cites *Guaranty Service Corp. v. American Employers' Insurance Co.* 898 F.2d 453 (5th Cir.1990) (per curiam) (applying Mississippi law and holding that the plaintiff can recover "investigation expenses incurred *prior to the litigation* ... if it can prove that [plaintiff] would not have incurred the expenses but for [defendant]'s misrepresentations and concealments") (emphasis added). Neither of the cases on which *Guaranty Service Corp.* relied concerned the recovery of expert witness fees as actual damages for fraud. *See Miss. Power & Light Co. v. Pitts,* 181 Miss. 344, 179 So. 363, 366 (1938) (addressing sufficiency of evidence to recover lost profits for breach of contract); *Shell Pe-*

troleum Corp. v. Yandell, 172 Miss. 55, 158 So. 787, 790 (1935) (same).

**36.** This is an inaccurate legal conclusion. A person may petition the court for an order authorizing the taking of a deposition on oral examination or on written questions to investigate a potential claim or suit. TEX.R. CIV. P. 202.1(b); *see also* TEX.R. CIV. P. 201.1 (governing depositions in foreign jurisdictions for use in Texas proceedings); 203.4 (governing exhibits to depositions). The scope of discovery in such a pre-suit deposition "is the same as if the anticipated suit or potential claim had been filed." TEX.R. CIV. P. 202.5.

*reason to have any liability, Counsel.*

Q: And the company that has been threatened with—that you believe was threatened with liability was [IFI], was it not?

A: I don't aim to look at it from that point of view. They threatened my—they are made in one place by one group of people. There's some legal structures, but they threaten a Citation entity; and that's the threat I take.

. . .

Q: So, the real issue, in your mind, is that there was a threat to the Citation entities as a whole. Correct?

A: Correct.

Q: You did not draw the distinctions between the legal entities that might actually have liabilities, did you, sir?

A: I did not.

Q: And you had this lawsuit filed by [ISW] in order to shield from an indemnity claim [IFI]. Correct?

A: That's one purpose of this. *There is also the ability to find out the root cause to find out whether there is really any liability on my part.*

(emphasis added).

Moreover, no evidence was presented that ISW's experts actually investigated the cause of the crankshaft failures before this suit was filed. And although one of ISW's experts testified that he was retained by ISW's attorney in October 2002, no evidence was presented that the experts at issue were retained independently

of litigation. To the contrary, ISW presented the testimony of one of its attorneys, Martin E. Rose, regarding (a) attorneys' fees, (b) expenses, and (c) expert fees *"in conjunction with the litigation."* Specifically, he testified that the expert fees incurred in conjunction with the litigation totaled $2,715,623.17. This figure is the identical amount found by the jury to represent the "reasonable and necessary expert expenses incurred in the investigation of the crankshaft failures" by "Interstate."

Buker also testified:

Q: And it's true, is it not, sir, that all of the experts that have been retained by Interstate Southwest, Ltd., and who will testify here in this Court were hired to do an investigation specifically for the purposes of this litigation?

A: Absolutely.

Tellingly, the only expert hired before this suit was filed was retained by one of the attorneys who represented ISW at trial. Attorney Bruce McKissock retained aircraft engine reconstruction expert James Irvin [37] in October 2002—the same month the *Flying Frog* suit was filed—but Irvin testified that he did not prepare a plan to test Lycoming engines until April 2003, and did not receive or prepare any Lycoming engines for testing until May 2003. He testified that he sought material from Lycoming by asking ISW's attorney to request information; based his opinions in part on review of depositions taken in this case; and transmitted his test results only to ISW's attorneys and to other experts used in the litigation. Each of the remaining experts was retained after suit was filed.[38]

---

**37.** This expert is also referred to as "James Ervin."

**38.** This suit was filed on April 23, 2003. Irvin testified that he visited a source for Lycoming engines on March 26, 2003, but began receiv-

ing the engines in May 2003. He then sent various samples and data to companies identified as SIMI and Matco, and there is no evidence that either company's work was performed before suit or outside this litigation. Dr. Anthony J. DeArdo was hired fifteen or

On this record, we conclude that the expert witness fees at issue are not actual damages caused by the fraudulent conduct alleged but instead are litigation expenses. *See King,* 725 S.W.2d at 755; *see also City of Houston v. Biggers,* 380 S.W.2d 700, 705 (Tex.Civ.App.-Houston 1964, writ ref'd n.r.e.) (holding that the "cost of experts and other expenses in preparation for trial are merely incidental expenses" of litigation). There being no remaining actual damages, we reverse those portions of the judgment incorporating or relying on the jury's findings that Lycoming committed fraud or fraudulent inducement or that ISW or IFI sustained actual damages. We sustain Lycoming's eighth issue [39] and render judgment that ISW, on its own behalf and on behalf of IFI, take nothing on its claims for fraud and fraudulent inducement. Because the jury's findings of fraud and fraudulent inducement fail to provide a basis for those portions of the judgment that relied on these findings, we also sustain Lycoming's fifteenth and seventeenth issues in part.[40]

## V. EXEMPLARY DAMAGES

In its tenth issue, Lycoming contends that, because the award for actual damages must be reversed, the award of exemplary damages must be reversed as well. *See Tex. Builders v. Keller,* 928 S.W.2d 479, 482 (Tex.1996) (per curiam) (reversing punitive damage award after concluding there were no compensable damages from fraud). We agree.

Exemplary damages are not available unless the plaintiff establishes that it sustained actual loss or injury as the result of an underlying tort. TEX. CIV. PRAC. & REM.CODE ANN. § 41.004(a) (Vernon Supp.2007); *Fed. Express Corp. v. Dutschmann,* 846 S.W.2d 282, 284 (Tex.1993) (per curiam) ("Recovery of punitive damages requires a finding of an independent tort with accompanying actual damages."). A plaintiff cannot recover punitive damages if its compensatory damage claim is precluded as a matter of law. *Entergy Gulf States, Inc. v. Isom,* 143 S.W.3d 486, 494 (Tex.App.-Beaumont 2004, pet. denied). "The mere availability of a tort-based theory of recovery is not

eighteen months before he testified in January 2005; thus, he appears to have been hired by June 2003. Dr. DeArdo worked with metals cut by Matco from material received from Irvin. Thermotemp performed work for ISW on April 6, 2004, nearly a year after suit was filed. Packer Engineering and its affiliated experts, Dr. John Meyer and Dr. Roch Shipley, were retained in June 2004. Dr. John Naumann was retained in September 2004. Chuck van Karsen performed some of the calculations for Drs. DeArdo and Meyer, both of whom were hired during the course of this litigation. As Dr. John Meyer for Packer Engineering testified, "It was actually pretty frustrating, initially, because there seemed to be—despite the maturity of the case, we were brought in to work on the case relatively recently."

39. Lycoming stated this issue as follows:

Did ISW fail to introduce legally sufficient evidence that any alleged fraud

proximately caused ISW or IFI to suffer damages, because (a) increased insurance premiums and expert witness fees incurred during litigation are not recoverable as damages in Texas, and (b) in any event, there is no evidence of proximate cause because the alleged act of reliance—entering into the Second Addendum—is not related to the alleged increase in insurance premiums or expert witness costs?

40. Lycoming argues in its fifteenth issue that the findings of the jury and the trial court "fail to provide a basis for the declaratory judgment and other equitable relief, as well as attorneys' fees, awarded by the trial court[.]" In its seventeenth issue, Lycoming asserts that the trial court erred when it purported to rescind the indemnity provision of the MSA that required IFI to indemnify Lycoming "as a result of the jury's finding of fraud...."

sufficient; actual damages sustained from a tort must be proven before punitive damages are available." *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995). Consequently, the exemplary damages awarded here must be reversed. *See Tex. Builders*, 928 S.W.2d at 482. We therefore sustain Lycoming's tenth issue and reverse that portion of the judgment awarding ISW exemplary damages.

## VI. DECLARATORY RELIEF

Lycoming argues in its fifteenth issue that the record and jury's findings are inadequate to provide a basis for declaratory judgment and other equitable relief, including attorneys' fees. In a subsidiary argument, Lycoming contends that certain declarations are contrary to law.[41]

We review declaratory judgments under the same standards as other judgments and decrees. TEX. CIV. PRAC. & REM. CODE ANN. § 37.010 (Vernon 1997). Thus, we review the legal sufficiency of the evidence supporting the declaratory judgments under the previously-described standard set forth in *City of Keller*, and review conclusions of law de novo. *Smith v. Smith*, 22 S.W.3d 140, 149 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

### A. Declaration Regarding Standing, Assignment, and Authority

In Declaratory Judgment 1, the trial court ruled that (1) the Assignment Agreement validly assigned the MSA to ISW; (2) the Assignment Agreement appointed ISW as IFI's attorney-in-fact with power to assert or enforce any claim or right "in connection with any transferred asset, including the [MSA]" and thereby assigned to ISW the right to prosecute and defend litigation related to the MSA and IFI; (3) ISW has standing to prosecute and defend claims related to the MSA; and (4) ISW is

authorized "to assert the claims in this lawsuit, in its own right as well as on behalf of [IFI]." Although the last ruling addresses only ISW's capacity to assert the claims in this case, the ruling is unnecessary because the trial court previously granted summary judgment on Lycoming's challenge to ISW's capacity and Lycoming has not challenged that judgment. The first three rulings are problematic for a different reason: these rulings purport to eliminate future challenges to ISW's standing and capacity to litigate claims related to the MSA on behalf of itself and on behalf of IFI. Neither the findings nor the record supports such broad relief.

The Declaratory Judgment Act is remedial in nature. TEX. CIV. PRAC. & REM.CODE ANN. § 37.002(b) (Vernon 1997); *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 164 (Tex.1993). It "cannot be invoked as an affirmative ground of recovery to revise or alter" existing rights or legal relations. *Republic Ins.*, 856 S.W.2d at 164. And as previously discussed, ISW's right to prosecute and defend litigation related to the MSA or to IFI depends on the particular claims asserted and the language of the Assignment Agreement. The trial court must examine the pleadings to determine standing, and review the scope of the assignment or power of attorney to assess capacity. In this instance, ISW has standing to assert the claims actually litigated, and Lycoming has waived its challenge to ISW's capacity to assert the claims in this lawsuit. But these circumstances do not necessarily apply to every claim ISW may assert in any forum in the future, and declaratory judgment relief is inappropriate when "the facts upon which the relief is sought are subject to mutation and change." *Tex. State AFL–CIO v. Brown*, 378 S.W.2d 917, 922 (Tex.Civ.App.-Austin 1964, writ ref'd

---

41. Lycoming also challenged the declaratory judgments as defensive pleadings, and we have addressed that argument in our discussion of standing.

n.r.e.) (citing *Cal. Prods. Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 591, 334 S.W.2d 780, 783 (Tex.1960)).

 In this case, ISW was not authorized to litigate IFI's claims for fraudulent conduct that occurred after the Assignment Agreement was executed, but there is no basis in law or in the record on which to conclude that Lycoming has waived its right to challenge ISW's capacity to assert other claims in other proceedings. And although Lycoming waived the right to challenge the trial court's failure to dismiss based on ISW's lack of capacity, Lycoming preserved its challenge to declaratory judgments that are not supported by findings or the record.

Here, the ruling that ISW is authorized to pursue IFI's tort claims is not supported by the record because the Assignment Agreement did not assign those claims or appoint ISW as its agent with respect to torts that had not yet occurred. *See First Nat'l Bank in Dallas v. Kinabrew,* 589 S.W.2d 137, 145 (Tex.Civ.App.-Tyler 1979, writ ref'd n.r.e.) ("The nature and extent of the authority granted must be ascertained from the instrument granting the power of attorney and such instrument is to be strictly construed to limit the authority of the attorney in fact."). IFI appointed ISW as its attorney-in-fact with regard to the assets transferred in 1996, but the tort claims at issue are not among those assets, and there is no evidence that IFI's subsequent tort claims were assigned to ISW. *See State Fid. Mortgage Co. v.*

*Varner,* 740 S.W.2d 477, 480 (Tex.App.-Houston [1st Dist.] 1987, writ denied) ("An assignee obtains only the right, title, and interest of his assignor at the time of his assignment, and no more."); *Pape Equip. Co. v. I.C.S., Inc.,* 737 S.W.2d 397, 399 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.) ("To recover on an assigned cause of action, one must plead and prove that a cause of action capable of being assigned *existed and was assigned* to the party alleging the theory of assignment."); *Esco Elevators, Inc. v. Brown Rental Equip. Co., Inc.,* 670 S.W.2d 761, 764 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.) ("In order to recover upon an assigned cause of action, one must allege and prove that *there was a cause of action,* that it was a cause of action that could be assigned, and that it had been assigned to him.") (emphasis added).

We see no basis on which to conclude that the common-law fraud or fraudulent inducement claims relate back to any point before the execution of the Assignment Agreement so as to render these claims assignable before the unforeseeable fraudulent conduct occurred.[42] Because Declaratory Judgment 1 is not supported by the jury's findings or by conclusive evidence, we sustain Lycoming's fifteenth issue in part and reverse the trial court's first declaration.[43]

## B. Declarations Concerning Indemnity Under Untried Legal Theories

In Declaratory Judgment 3,[44] the trial

---

42. The Texas Supreme Court has also "prohibited assignments that may skew the trial process [and] confuse or mislead the jury...." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners L.P.,* 146 S.W.3d 79, 90 (Tex. 2004).

43. When reversing a declaratory judgment, an appellate court generally renders the judgment the trial court should have rendered. Here, however, ISW did not ask the trial

court to interpret the contract, but instead asked only that the trial court make certain specific findings. We therefore do not go beyond the requested relief, but restrict our rulings to reversing the trial court's conclusions that are not supported by evidence or authority.

44. We discern no challenge to Declaratory Judgment 2.

court ruled as follows:

> Because a defect in Defendant [*Lycoming's*] *design of the crankshafts was the sole cause of the crankshaft failures* ... [Lycoming] cannot recover, in whole or in part, any ... [Damages] ... relating in any way to, or arising out of, the crankshaft failures ... from [ISW] and/or [IFI] and/or their successors or assigns under the [MSA] or its Addenda, Section 5.3 of the [MSA] *or any other legal theory that would impose liability on [ISW] and/or [IFI] and/or their successors or assigns, regardless of whether [Lycoming] asserts the right to recover such DAMAGES, if any, under the common law, case law, statute, rule or otherwise, including but not limited to claims for contribution, implied or express indemnity, negligence, strict liability or breach of any express or implied contract or warranty* ....

(emphasis added). The trial court's fourth and fifth declarations contain similarly overbroad language. In sum, the trial court ruled in these judgments that Lycoming cannot recover any damages from IFI or ISW by relying on (a) the MSA and its Addenda, or (b) any other legal theory, whether "common law, case law, statute, rule or otherwise...." We hold these conclusions are unsupported by the findings or the record.

■ Assuming that the MSA's indemnity provisions are enforceable, the findings do not support the trial court's conclusions because the facts found pertain to Lycoming's indemnification obligations rather than to the indemnification obli-

gations of IFI or ISW. Under the second paragraph of section 5.3 of the MSA, IFI is required to indemnify Lycoming for damages "arising out of any claim, lawsuit ... recall, retrofit or government investigation or proceeding against [Lycoming] relating to performance or defect ... for any Products manufactured by Seller pursuant to [the MSA] *except to the extent that such Damages are directly caused by the negligence of [Lycoming]*." (emphasis added). In asking the jury whether a design defect was the sole cause of the failures, ISW appears to have focused on the first paragraph of section 5.3 of the MSA. But that provision does not address the obligations of IFI or ISW to indemnify Lycoming; rather, it governs Lycoming's narrower duty to indemnify IFI "where liability is based solely on a defect in design...." Although ISW had previously requested declaratory judgment regarding Lycoming's indemnification obligations, it amended its pleadings to withdraw that request. In its live pleadings at the time of trial, ISW instead sought to clarify its own indemnification obligations and those of IFI. Specifically, in its Sixth Amended Petition, ISW asked for a finding that all of Lycoming's losses were directly caused by Lycoming's negligence, and thus, Lycoming was not entitled to indemnity under the MSA—an issue that corresponds with the second paragraph of section 5.3. The jury's finding that a design defect was the sole cause of the failures (as described in the first paragraph of section 5.3) is not equivalent to a finding that Lycoming was negligent (as described in the second paragraph of section 5.3),[45] but instead pertains

---

45. *See Humble Sand & Gravel, Inc. v. Gomez,* 146 S.W.3d 170, 181 n. 17 (Tex.2004):

> The care taken by the supplier of a product in its preparation, manufacture or sale, is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the acts of the

manufacturer and determines if it exercised ordinary care in design and production. (quotation omitted); *see also Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374, 375–76 (Tex.1978) (holding that the doctrine of strict liability "applies even though the seller has exercised care in the preparation and sale of the product....").

to a claim that was withdrawn. And although Lycoming proposed a jury question that would have determined whether the failures were caused by Lycoming's direct negligence as set forth in ISW's pleadings, the trial court sustained ISW's objections to the proposed charge.[46]

■ When a plaintiff fails to request an issue and an affirmative finding regarding the omitted issue is essential to recovery, the trial court must render judgment for the defendant. *Dallas County Med. Soc'y v. Ubinas–Brache,* 68 S.W.3d 31, 40 (Tex.App.-Dallas 2001, pet. denied). In the absence of a jury finding or conclusive evidence that the failures were directly caused by Lycoming's negligence, ISW was not entitled to a declaration that Lycoming could not recover its losses under the MSA as stated in this ruling.

Moreover, we cannot affirm the trial court's judgment that Lycoming is barred from recovery under any other theory. This sweeping declaration is unsupported by the record, which does not show that the issues tried included every legal theory under "common law, case law, statute, rule or otherwise" that Lycoming might assert as a basis for indemnification. Because these rulings address unadjudicated claims and causes of action, we sustain Lycoming's fifteenth issue as it pertains to Declaratory Judgments 3, 4, and 5, and we reverse these portions of the judgment.

## C. Enforceability of Provision Requiring Seller to Indemnify Buyer

■ In its eighteenth issue, Lycoming contends the trial court erred in reaching the conclusion of law stated in Declaratory Judgment 6:

The indemnification agreement contained in the second paragraph of Section 5.3 of the MSA, which requires the Seller to indemnify Buyer under certain circumstances[,] is unenforceable as a matter of law because it does not meet the legal requirements for indemnification agreements under Texas or Pennsylvania law....

ISW responds that the indemnity provision is unenforceable because it does not satisfy the express-negligence rule, which requires a party seeking indemnity for its own negligence to express that intent within the four corners of the document.

■ We agree that the express-negligence rule applies to this provision. Here, the "Seller" is required to hold Lycoming harmless from all costs and damages:

whether or not involving liability to any third party, from or arising out of any claim, lawsuit ... recall, retrofit or government investigation or proceeding against [Lycoming] *relating to performance or defects* (including without limitation, manufacturing defects) ... *for any Products manufactured by Seller* pursuant to this Agreement, *except to the extent that such Damages are directly caused by the negligence of [Lycoming ]*.

(emphasis added). Although Lycoming argues that the express-negligence doctrine does not apply because the provision does not shift liability for Lycoming's negligence, this interpretation ignores the word "directly." The provision as written shifts liability for claims and consequences of Lycoming's negligence if causation is indirect.[47] Moreover, the express-negligence rule applies to indemnification for strict

---

**46.** Lycoming proposed the jury question: "Do you find that all of Lycoming's losses related to the crankshaft forgings provided under the MSA were directly caused by the negligence, if any, of Lycoming?" ISW objected and argued that it was entitled to the "factual deter-

mination" of whether a design defect was the sole cause of the failures.

**47.** Such indirect causation could be found, for example, in cases of vicarious liability.

liability claims. *Houston Lighting & Power Co. v. Atchison, Topeka, & Santa Fe Ry. Co.*, 890 S.W.2d 455, 459 (Tex.1994) ("[P]arties to an indemnity agreement must expressly state their intent to cover strict liability claims in specific terms."). In the absence of authority or evidence to the contrary, we presume that Pennsylvania, like Texas, applies an express-negligence rule to strict liability claims. *See Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex.2006) ("Texas courts *can* presume that the determinative law of another state is the same as Texas law absent proof or argument to the contrary ....."); *see also* TEX.R. EVID. 202 (addressing determination of the law of other states). Pennsylvania law also provides that "indemnification provisions are given effect only when clearly and explicitly stated in the contract between two parties." *Bernotas v. Super Fresh Food Mkts., Inc.*, 581 Pa. 12, 20, 863 A.2d 478, 483 (2004); *see also Greer v. City of Philadelphia*, 568 Pa. 244, 248–49, 795 A.2d 376, 379 (2002) (stating that indemnification provisions are enforced only if the language "clearly and unequivocally demonstrates that [the indemnitor] intended to provide such indemnification").

On appeal, Lycoming relies on *Green International, Inc. v. Solis* to support its argument that the express-negligence rule does not apply to Lycoming's claim for reimbursement for its own economic losses. 951 S.W.2d 384, 387 (Tex.1997) (holding that a "no-damages-for-delay" contract clause that shifts economic damages for breach of contract and does not shift liability for third-party tort and negligence damages is not an indemnity agreement). Here, however, the contract provision at

issue does shift liability for third-party claims, and the economic losses for which Lycoming seeks indemnification [48] are the result of a product defect to which the express-negligence rule applies, rather than a contract claim to which the rule does not apply.

We therefore conclude that the indemnification provision found in the second paragraph of section 5.3 of the MSA is unenforceable under Texas and Pennsylvania law. Accordingly, we overrule Lycoming's eighteenth issue and affirm the trial court's ruling stated in Declaratory Judgment 6.[49]

## VII. ISW'S CLAIMS OF BREACH OF CONTRACT AND VIOLATION OF SECTION 2.306

### A. ISW's Contentions

In two cross-issues, ISW contends the trial court erred in granting Lycoming a partial directed verdict. In analyzing a directed verdict, we apply the same standard of review applicable to summary judgments and judgments notwithstanding the verdict. *See City of Keller*, 168 S.W.3d at 823. Thus, we review the evidence in the light most favorable to the non-movant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 827.

Here, ISW challenges the directed verdict denying its claim that Lycoming violated section 2.306 of the Business and Commerce Code and breached the MSA by demanding more crankshaft forgings than Lycoming actually required. Section

---

48. As previously noted, Lycoming has asserted its claims for indemnification in Pennsylvania, rather than in this action.

49. We further note that this determination is an independent reason to conclude that nei-

ther IFI nor ISW were fraudulently induced to enter a contract extending its indemnity obligations for another five years. *See Haase v. Glazner*, 62 S.W.3d 795, 800 (Tex.2001) (stating that a party cannot be fraudulently induced to enter an unenforceable contract).

2.306 generally governs requirements contracts, and provides as follows:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

TEX. BUS. & COM.CODE ANN. § 2.306(a) (Vernon 1994). Thus, the Business and Commerce Code imposes a requirement of good faith on the buyer, and limits the buyer's ability to demand the product in an amount that is unreasonably disproportionate to the "stated estimate."

The MSA and its Addenda constitute a requirements contract with the following pertinent provisions:

> ¶ 1.3 *"Planning Volumes"* means Buyer's [i.e., Lycoming's] estimated annual requirements.

> . . .

> ¶ 2.2 *Capacity Reservation.* Seller, at no expense or cost to Buyer, will commit plant, equipment and personnel sufficient to support Buyer's Planning Volumes for each part number of Products. Buyer will promptly advise Seller of Buyer's initial Planning Volumes and changes in the Planning Volumes. Buyer may change its Planning Volume at any time during any Contract Year by giving not less than six weeks prior written notice to Seller.

ISW contends that after this suit was filed, Lycoming began ordering more forgings than it required and stockpiled the excess while it looked for a new supplier. ISW further alleges that, "[a]s a result of running Lycoming's unnecessary products on its press forge, ISW incurred $359,200 in additional maintenance, additional overtime, and increased set-up expenses."

 Lycoming moved for partial directed verdict on these claims on the grounds that: (1) there was no evidence Lycoming ordered beyond its requirements, (2) there was no evidence ISW was damaged as a result of any violation of section 2.306, and (3) section 2.306 does not provide the basis for an affirmative claim and can only be used defensively. As discussed below, there is no evidence that ISW ordered beyond its requirements or that ISW was damaged by the alleged increase; thus, we affirm the partial directed verdict without reaching Lycoming's contention that section 2.306 may only be used as a defense.

## B. Claim Barred by Parties' Agreement

 Section 2.306, like many other provisions of Article 2 of the Uniform Commercial Code, "is a gap-filler and may be varied by the parties' agreement." *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 570 (Tex.1996) (op. on reh'g). The statute provides the quantity term only when the contract does not unambiguously specify the quantity of the output of the seller or the requirements of the buyer. *Id.* (citing section 2.306(a)). Here, Buker testified that the parties agreed on the number of crankshafts to be produced during the relevant time period:

> Q: And in fact there was an agreement reached between Citation and Lycoming on the number of crankshafts that would be produced through the end of the MSA in May of 2005, correct?
>
> A: Correct.
>
> . . .
>
> Q: And the agreement was for approximately 10,000 crankshafts to be pro-

duced by Citation for Lycoming, correct?

A: Yes, sir.

Q: And that's what you agreed to do?

A: Yes, sir.

Q: And you, in fact, did not do that, did you, sir?

A: We did not, no.[50]

Because the parties reached an agreement regarding the number of crankshaft forgings to be produced, we conclude that section 2.306 does not apply.

## C. No Evidence of Damages

Regardless of whether ISW's claim is styled as a claim for violation of section 2.306 or as a common-law claim for breach of contract, there is no evidence that Lycoming's requirements caused damage. ISW argues on appeal that Lycoming increased its requirements after ISW filed suit on April 23, 2003. ISW then relies on Buker's testimony to establish damages. But as Buker testified, these costs were incurred beginning in late 2001 or 2002, prior to the lawsuit and the alleged increase in requirements. Moreover, the costs were incurred as the result of ISW's settlement with Lycoming over the failure to heat-treat earlier forgings, resulting in a prior series of crankshaft failures. Buker testified that as part of that settlement, ISW agreed to a change in processing, and it is that change which caused the increase in costs:

A: In one of our previous production runs we failed to heat-treat correctly a component and sent it to Lycoming and they caught it. *And we agreed, as part of the settlement, to build press-tooling or hammer-tooling to put the parts on the press* and we did that.

Q: Do you recall approximately when the press-forged 707 cranks [51] began in production?

A: I can—it would have been sometime in late 2001, early 2002.

. . .

Q: In connection with that conversion of the crankshafts from the hammer—forge process to the press-forge process, has Interstate incurred—or has that conversion impacted the operational costs of Interstate?

A: The conversion to press has—on the press line it was converted to, it raised the repair costs and the die change cycle on that press.

Q: Explain what you mean by that.

A: You have a lot of customers on one press; and when you have more business coming on a press, you increase the amount of die changes necessary to meet requirements. If you had one die in there and you ran it for 1,000 pieces, you could only run it for 750; you begin to change more dies. And it's, basically, more repetitive die changes to do that.

Q: As a consequence of running these parts on the press, did you notice any effect on the equipment that was being used to run these cranks?

A: Yes, sir.[52]

50. There is no evidence that Citation, ISW, or IFI produced crankshafts under a reservation of rights or otherwise performed under protest. Moreover, in one of the Pennsylvania proceedings, Citation and IFI agreed to the entry of an Agreed Order for Preliminary Injunction requiring *them* to produce the crankshaft forgings. This order was entered on June 12, 2003, less than two months after this lawsuit was filed.

51. This is the crankshaft model that experienced the failures at issue in this suit.

52. Objection and ruling omitted.

Q: Tell me about that.

A: The running—every time we ran the Lycoming products, we had increased maintenance costs for the heaters and a dramatically increased maintenance cost for the roll reducer, the first step in making the billets smaller. It's the only job we run on the roll reducer now. And the press clutches started wearing out, instead of nine to ten months, in 90 days.

Q: Have you attempted, Mr. Buker, to quantify the additional expense incurred by Interstate *as a consequence of running these crankshafts on the press line?*

A: Yes sir, we have.

Q: Can you tell me what that calculation is?

A: We looked at the additional cost of maintenance, the additional cost of overtime, and the reduction in uptime of the press; and that cost is approximately $300,000—let me get the exact number for you here—350,000—$359,200.

Q: 359,200?

A: Yes, sir.

Q: And that represents what, sir?

A: A combination of additional maintenance, additional weekend overtime work, and spare parts to run these products.

Q: Now, in connection with the conversion to the press line, did you incur any increased setup expenses?

A: That would have been included in the $359,000.

(emphasis added.) We further note that ISW's David Lisowski also testified that by agreeing to settle these claims by re-tooling, "we were going to make out on the deal."

On the record before us, we conclude there is no evidence of damages to support ISW's claim that Lycoming breached the MSA, violated section 2.306 of the Business and Commerce Code, or damaged IFI or ISW by increasing its requirements in bad faith after ISW filed suit. Our analysis is unaffected by ISW's assertion that Lycoming admitted it was ordering ahead of its actual needs, or stockpiling. Specifically, ISW relies on the deposition testimony of Ronald L. Clayton, one of Lycoming's Procurement Managers, that "[w]e are buying crankshaft forgings ahead *on our current schedule.*" (emphasis added). This testimony pertains to facts as they existed on January 4, 2005 and concerns Lycoming's purchases from a different supplier. We overrule ISW's first cross-issue and affirm the partial directed verdict without reaching ISW's second cross-issue.

## VIII. ATTORNEYS' FEES

The trial court awarded attorneys' fees and costs to ISW under the Declaratory Judgments Act. Under this Act, the trial court "may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). Here, the jury made a finding regarding the fees that were "reasonable and necessary," and the trial court concluded, based on the jury's finding, that the award of attorneys' fees and costs was "equitable and just." However, we are not "reasonably certain that the jury was not significantly influenced by the erroneous amount of damages it considered." *Barker v. Eckman,* 213 S.W.3d 306, 313–14 (Tex.2006). In light of our disposition of the issues on appeal, we reverse the award of attorneys' fees and costs and remand the case solely for consideration of the costs and reasonable, necessary, equitable, and just attorneys' fees, if any, to award to either party. TEX.R.APP. P. 43.3; *Young v. Qualls,* 223 S.W.3d 312, 314–15 (Tex.2007) (per curiam); *Neeley,* 176 S.W.3d at 799.

## IX. CONCLUSION

Because ISW and IFI sustained no actual damages, we reverse the judgment on the tort claims and render judgment that ISW take nothing. Because the trial court's award of costs and attorneys' fees was expressly based on the jury's findings and we are not reasonably certain the jury was not significantly influenced by the erroneous amount of damages it considered, we reverse the awards of costs and attorneys' fees and remand solely for a determination of the appropriate award, if any, to be made to either party in light of this opinion. We affirm the trial court's declaration that the indemnity provision found in the second paragraph of section 5.3 of the MSA is unenforceable under Texas and Pennsylvania law, but we reverse the trial court's rulings stated in Declaratory Judgments 1, 3, 4, and 5, which are overly broad and unsupported by the record. We affirm the partial directed verdict dismissing ISW's claims that Lycoming breached its contract and violated section 2.306 of the Business and Commerce Code. In sum, our ruling leaves the trial court's second and sixth declaratory judgments intact but reverses the final judgment in all other respects.[53]

## APPENDIX

■ Does ISW lack standing to sue Lycoming for fraud and punitive damages on behalf of IFI because the alleged assignment of rights from IFI to ISW predated by five years the events that gave rise to these claims, and thus these claims could not have been transferred to ISW from IFI by the assignment?

■ Did ISW fail to introduce legally sufficient evidence that Lycoming knowingly made any false, material representations of fact to ISW or IFI?

■ Did ISW fail to introduce legally sufficient evidence that Lycoming had a "duty to disclose" facts to ISW or IFI in this arms-length commercial relationship?

■ Even assuming Lycoming owed a duty to disclose, did ISW fail to introduce legally sufficient evidence that Lycoming fraudulently breached any such duty by knowingly concealing material facts with intent to defraud ISW or IFI?

■ Did ISW fail to introduce legally sufficient evidence of justifiable and detrimental reliance, especially given that IFI's chairman said he did not believe Lycoming's statements that IFI's overheating during forging caused the crankshaft failures?

■ Are ISW's "fraud" claims really disguised—and legally baseless—inchoate malicious prosecution claims?

■ Did ISW fail to introduce legally sufficient evidence to show, by "clear and convincing" evidence, that anyone at Lycoming acted with fraud or malice that would justify the extraordinary remedy of punitive damages?

■ Did ISW fail to introduce legally sufficient evidence that a Lycoming "vice-principal" engaged in, knowingly authorized or approved fraudulent or malicious conduct?

■ Is ISW's punitive damage claim barred as a matter of law because, at most, the fundamental dispute in this case involves a reasonable, genuine disagreement regarding the cause of the crankshaft failures?

■ Did the trial court erroneously exclude from evidence the FAA report . . . that analyzes the crankshaft failures at issue and concludes that IFI's overheat-

---

**53.** In light of our disposition, we do not reach ISW's second cross-issue or the remaining issues presented by Lycoming, which are enumerated in the attached Appendix.

ing during forging, not a design defect, was the root cause of the failures?

■ Did the trial court erroneously exclude other evidence that would have shown Lycoming's good faith state of mind and demonstrated the integrity and thoroughness of its investigation and conclusions about the cause of the crankshaft failures, including evidence that one of Lycoming's competitors—Teledyne—experienced similar failures and determined that overheating was a cause of the failures of its crankshafts?

■ Did the trial court erroneously exclude evidence, including Lycoming's stipulation, that Lycoming was not seeking and would never seek indemnity from ISW?

■ Did the trial court's jury instructions erroneously fail to distinguish between ISW and IFI, conflating them into one single non-existent entity, "Interstate"?

■ Did the trial court erroneously refuse to instruct the jury on when, if ever, a duty to disclose that can give rise to a fraud claim arises in a commercial context?

■ Did the trial court erroneously refuse to instruct the jury that it could not punish Lycoming for alleged conduct directed at third parties not before the court or for conduct that occurred outside of Texas, and then erroneously allow ISW's counsel to argue that the jury should punish Lycoming in order to vindicate the alleged rights of personal injury victims around the nation, in direct violation of the due process principles established by the U.S. Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)?

■ Did the trial court's punitive damages instructions, which omitted basic legal requirements, violate Texas law and due process?

■ Does the $86.4 million damage award, which is 51 times larger than the relevant compensatory portion of the judgment and 59% of AVCO's net worth and 10% of its total assets, violate Texas law because it exceeds the statutory punitive damages cap, TEX. CIV. PRAC. & REM.CODE § 41.008(b)(1)(A), and ISW failed to meet the requirements for exceeding the cap as a matter of law?

■ Does the $86.4 million punitive damage award violate the federal constitutional limits imposed by the Due Process Clause of the Fourteenth Amendment, *see State Farm,* 538 U.S. 408[, 123 S.Ct. 1513, 155 L.Ed.2d 585] (2003)?

## SUPPLEMENTAL OPINION ON REHEARING

EVA M. GUZMAN, Justice.

In its motion for rehearing, Lycoming argues this court erroneously concluded that it did not challenge the portion of the declaratory judgment in which the trial court stated that a design defect was the sole cause of the crankshaft failures. Lycoming then argues that this portion of the judgment should be reversed because it (a) is a restatement of a factual finding unconnected to any form of relief that survives our November 1, 2007 decision, (b) is tainted by evidentiary error, and (c) conflicts with our ruling that "specifically preserves Lycoming's right to pursue indemnity and other recovery against IFI and ISW under a variety of possible theories of law." [1] We deny Lycoming's motion for rehearing [2] and issue this supplemental opinion to clarify the reasons for this ruling. [3]

---

1. Lycoming argues, "The Court, however, mistakenly assumed that Lycoming did 'not challenge[ ] on appeal' 'paragraph 2, page 4 of the Final Judgment.' " Appellant's Motion for Rehearing, at 2.

2. We contemporaneously deny appellee's motion for rehearing.

## I. ISSUES PRESENTED BY LYCOMING ON MOTION FOR REHEARING

### A. Alleged Challenge to Declaratory Judgment 2[4]

"Declaratory Judgment 2" consists of the trial court's statement, "A defect in [Lycoming]'s design of the crankshafts was the sole cause of the crankshaft failures and the resulting service bulletins, airworthiness directives, crankshaft recall and grounding of aircraft with Lycoming engines...." Lycoming argues that it challenged Declaratory Judgment 2 in the issue that we identified as Issue Fifteen, in which Lycoming argued that the findings of the jury and the trial court "fail to provide a basis for the declaratory judgment and other equitable relief, as well as attorneys' fees, awarded by the trial court[.]"[5] Specifically, Lycoming refers us to pages 29–30 of its opening brief, in which it argues as follows:

> The declaratory relief claim also fails because *the trial court did not make the necessary findings to support such relief.* The court signed ISW's proposed judgment exactly as ISW submitted it and thus merely *adopted the jury's finding* in response to Question 8 that "[a] defect in Defendant AVCO Corporation's design of the crankshafts was the sole cause of the crankshaft failures and the resulting service bulletins, airworthiness directives, crankshaft recall and grounding of aircraft with Lycoming engines." *This finding, however, is insufficient to support the declaratory relief the court entered because Question 8 does not address the MSA's indemnity provision, as ISW's counsel conceded.*

(emphasis added, record citations omitted). We agree that the finding (i.e., the jury's sole-cause finding) does not support the "declaratory relief" entered (i.e., the declaration of the parties' rights and duties in Declaratory Judgments 3–5 of the Final Judgment). But we disagree that the statement in Declaratory Judgment 2 that a design defect is the sole cause of the failures is included in "the declaratory relief" that Lycoming's brief describes.

---

3. The appellate court retains plenary jurisdiction over its judgment for thirty days after overruling all timely-filed motions for rehearing. TEX.R.APP. P. 19.1(b).

4. Appellant's Motion for Rehearing, at 1 ("Issue Presented"). This issue is rephrased on page 4 of the motion as "Appellant Clearly Sought Reversal of Declaratory Judgment 2 on Appeal."

5. Lycoming further argues in its Motion for Rehearing:
 > This issue—*which this Court not only quoted* verbatim in 40 of its opinion *but also sustained*, does not distinguish between Declaratory Judgment 2 and the other portions of the declaratory judgment, but instead challenges that judgment in its entirety.

 (internal citations omitted, emphasis added). In fact, we stated three times that we sustained Issue Fifteen only *in part,* and only as it pertained to the jury's findings of fraud and fraudulent inducement and Declaratory Judgments 1, 3, 4, and 5. *AVCO Corp. v. Interstate Sw., Ltd.,* 251 S.W.3d 632, 661–62, 2007 WL 4845443, at *23 (Tex.App.-Houston [14th Dist.] Nov. 1, 2007, no pet. h.) ("Because the jury's findings of fraud and fraudulent inducement fail to provide a basis for those portions of the judgment that relied on these findings, we also sustain Lycoming's fifteenth and seventeenth issues *in part.*") (emphasis added); *id.,* 2007 WL 4845443, at *26 ("Because Declaratory Judgment 1 is not supported by the jury's findings or by conclusive evidence, we sustain Lycoming's fifteenth issue *in part* and reverse the trial court's first declaration.") (emphasis added); 2007 WL 4845443, at *27 ("Because these rulings address unadjudicated claims and causes of action, we sustain Lycoming's fifteenth issue as it pertains to Declaratory Judgments 3, 4, and 5, and we reverse *these portions* of the judgment.") (emphasis added).

Lycoming argued that the jury's finding does not support the declaratory relief entered because the finding "does not address the MSA's indemnity provision...." On its face, this argument applies to Declaratory Judgments 3, 4, and 5, which purport to address the MSA's indemnity provision. But Declaratory Judgment 2 does not address the indemnity provision. Moreover, Declaratory Judgments 3, 4, and 5 offer "declaratory relief" because in these portions of the judgment, the trial court declares the rights of the parties, albeit erroneously. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.003(a) (Vernon 1997) ("A court of record within its jurisdiction has power to *declare rights, status, and other legal relations* whether or not further relief is or could be claimed.") (emphasis added). But in Declaratory Judgment 2, the trial court merely repeats the jury's factual finding; it offers no "declaratory relief" because it makes no declaration of the rights, status, or other legal relations between the parties. *See Indian Beach Prop. Owners' Ass'n v. Linden,* 222 S.W.3d 682, 699 (Tex.App.-Houston [1st Dist.] 2007, no pet.) ("The power to determine an issue of fact, however, 'does not concomitantly carry with it the power to render such a finding of fact as a declaratory judgment.'" (quoting *Hill v. Heritage Res., Inc.,* 964 S.W.2d 89, 140 (Tex.App.-El Paso 1997, pet. denied))).

We must also emphasize that Lycoming did not challenge Declaratory Judgment 2 on the basis that it is a bare statement of fact, and did not previously contend that a declaratory judgment "is not the proper remedy if a factual dispute is the only issue to be resolved." *See Querencia Props., S. de R.L. de C.V. v. New Querencia Capital Partners, L.L.C.,* 224 S.W.3d 348, 352 (Tex.App.-Dallas 2006, no pet.); *Emmco Ins. Co. v. Burrows,* 419 S.W.2d 665, 671 (Tex.Civ.App.-Tyler 1967, no writ). To the contrary, in the quoted language in its brief, Lycoming only argued that the sole-cause finding is insufficient to support "the declaratory relief the court entered" because the finding does not also address indemnity. On its face, then, this argument appears to challenge the declarations concerning the right to indemnity (i.e., Declaratory Judgments 3, 4, and 5), and does not appear to challenge Declaratory Judgment 2.

In contrast, Lycoming's argument on rehearing is based on the premise that the trial court's repetition of the jury's "sole cause" finding is "declaratory relief" to which the argument in Lycoming's Appellate Brief applies. But if this is so, then the argument in Lycoming's Appellate Brief is circular. Specifically, if Declaratory Judgment 2 is part of the "declaratory relief" included in the challenge as briefed, then Lycoming's argument with respect to this portion of the judgment can be restated as follows: "The jury's finding *that design defect was the sole cause of the crankshaft failures* is insufficient to support the trial court's declaration *that design defect was the sole cause of the crankshaft failures* because the jury's finding does not address the MSA's indemnity provision." Reduced to its simplest form, Lycoming's argument is that "A" does not equal "A," because "A" does not equal "A + B."[6]

If this argument presents a challenge to Declaratory Judgment 2, then further explanatory argument was required. If we had considered the trial court's statement to be "declaratory relief" encompassed within the argument presented in Lycoming's original brief, then contrary to Lycoming's assertion on appeal, and in the absence of an explanatory argument, it

**6.** Although "A" (the sole-cause finding) does not address "B" (the MSA's indemnity provision), neither does Declaratory Judgment 2, which merely repeats "A."

would seem logically unassailable that a jury's finding of fact is sufficient support for a trial court's recitation of the same fact.[7] Thus, if we had read Lycoming's brief as presenting this argument, we would have considered the argument waived for inadequate briefing. *See* TEX. R.APP. P. 38.1(h); *Jordan v. Jefferson County*, 153 S.W.3d 670, 676 (Tex.App.-Amarillo 2004, pet. denied). Instead, we read Lycoming's brief to present the logical argument that the declaration of the parties' rights in Declaratory Judgments 3, 4, and 5, which *do* address the MSA's indemnity provision, is not supported by the jury's sole-cause finding that does *not* address the MSA's indemnity provision. This argument, which follows the form "A ≠ A + B," does not suffer from the logical inconsistency of the argument previously discussed.

### B. FAA Report

Lycoming also contends it "argued at length that the trial court's exclusion of the FAA report was a highly prejudicial error that directly impacted *all* of ISW's claims."[8] But in response to ISW's hearsay objection at trial, Lycoming stated that the FAA report was not offered for the truth of the matters asserted, but was instead offered to show Lycoming's state of mind in connection with the fraud claims. Not only is evidence of Lycoming's state of mind irrelevant to the determination of the actual cause of the crankshaft failures, but the argument now advanced conflicts with Lycoming's position at trial.

### C. No Specific Preservation of Right to Pursue Indemnity

Lycoming further argues as follows:

> This Court's opinion directly conflicts with Declaratory Judgment 2 in another, even more explicit way. The opinion specifically preserves Lycoming's right to pursue indemnity and other recovery against IFI and ISW under a variety of possible theories of law. Yet ISW has already begun to publicly assert that Declaratory Judgment 2 somehow precludes such recovery, in disregard of this Court's express language to the contrary.[9] In short, this Court should reverse Declaratory Judgment 2 in order to ensure that its November 1 judgment is fully vindicated-and not undermined by ISW, as ISW has already made clear that it and IFI hope to do.[10]

But our opinion does not "specifically preserve[ ] Lycoming's right to pursue indemnity and other recovery against IFI and ISW" as Lycoming asserts. To the contrary, we emphasized that one reason that the trial court's declaratory judgments were overbroad is that Lycoming's right to pursue other claims under unidentified theories of recovery was not at issue.[11] Thus, we have not and do not express an opinion on the availability of any other unidentified theories of indemnity.

7. Lycoming did not preserve and present an appellate challenge to the legal and factual sufficiency of the evidence supporting the jury's sole-cause finding.

8. Appellant's Motion for Rehearing, at 1 ("Issue Presented").

9. This contention is based on material that is not part of the record.

10. This exhortation is phrased on page 7 of the motion for rehearing as "Declaratory Judgment 2 Directly Conflicts with This Court's November 1 Ruling in Multiple Ways and Therefore Must Be Reversed."

11. A claim for declaratory judgment is not required to be tied to a valid cause of action for damages. *See, e.g.,* TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(b) (a contract may be construed before a breach).

## II. CONCLUSION

Lycoming did not previously argue that the recitation of the jury's finding in Declaratory Judgment 2, unconnected to any surviving claim, was an improper application of the Declaratory Judgment Act. Generally, we do not base our rulings on arguments raised for the first time on rehearing. *Sherrod v. Moore*, 819 S.W.2d 201, 205 (Tex.App.-Amarillo 1991, no writ) ("It is well established that [issues] raised for the first time in a motion for rehearing are too late and will not be considered." (citing *Morrison v. Chan*, 699 S.W.2d 205, 206–07 (Tex.1985))); *see also Brown v. Hearthwood II Owners Ass'n, Inc.*, 201 S.W.3d 153, 161 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (holding that failure to "advance substantive analysis waives the issue on appeal"); *Cont'l Dredging, Inc. v. De-Kaizered, Inc.*, 120 S.W.3d 380, 400 (Tex.App.-Texarkana 2003, pet. denied) (op. on reh'g) (refusing to consider arguments raised in a motion for rehearing but not raised on original submission); *Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 646 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (stating that an issue adequately briefed in a motion for rehearing is waived if the original brief "is not sufficient to acquaint the Court with the issue and does not present an argument that would allow the court to decide the issue"); *ICM Mortgage Corp. v. Jacob*, 902 S.W.2d 527, 535 (Tex.App.-El Paso 1994, writ denied) (op. on reh'g) ("The appropriate time to seek relief on this ground, however, was on original submission in this Court, not on rehearing.").

In sum, Lycoming chose to present twenty-seven issues to this court on appeal. This strategy was successful. Nevertheless, Lycoming now asks the court to consider a twenty-eighth issue, and, based

on grounds that were not previously argued, to eliminate an unchallenged finding resulting from a six-week jury trial. It has not addressed its failure to brief these arguments previously, and has not shown harmful error.[12] *See* TEX.R.APP. P. 44.1 (establishing the standard for reversible error). We therefore deny Lycoming's motion for rehearing.

---

12. *See Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 164 (Tex.1993) (the Declaratory Judgment Act "cannot be invoked as an affirma-

tive ground of recovery to revise or alter" existing rights or legal relations).